THOMAS, Judge.
In 2006, K.H., Ke.R., and Ka.R. (referred to collectively as “the children”) were removed from the custody of L.R. (“the mother”) by the Morgan County Department of Human Resources after the two older children were subjected to sexual abuse at the hands of neighbors with whom the mother had left those children. The children had been in the custody of the mother pursuant to a divorce judgment; D.E.R. (“the father”) was incarcerated at the time the children were removed from the mother’s custody. The children were placed with C.G. (“the maternal grandfather”) and M.G. (“the maternal grandmother”) (sometimes referred to collectively as “the maternal grandparents”) as part of a safety plan in April 2006; at that time, the mother came to live with the maternal grandparents in Decatur.
The maternal grandparents ordered the mother to leave their home at some point after the maternal grandmother discovered the mother using drugs in the home. The maternal grandparents were awarded permanent legal and physical custody of the children in June 2008. Although that custody judgment does not appear in the record, the parties agree that it awarded the mother visitation and ordered the mother to pay $75 per month in child support; it apparently did not address any rights or responsibilities of the father.
In June 2010, the maternal grandparents filed a petition seeking to terminate the parental rights of the mother and the father to the children. In their petition, the maternal grandparents alleged that the mother and the father had *438 abandoned the children, that the mother had exercised only limited visitation in the months before the filing of the petition, that the mother and the father had left the children without necessary care, that the mother and the father had not improved their circumstances in order to be able to adequately care for the children, and that the father was presently incarcerated. After a trial on September 23, 2010, the juvenile court entered judgments on November 18, 2010, terminating the parental rights of the mother and the father to each of the three children. ’ Both the mother and the father appeal from those judgments. We have consolidated the appeals.
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004). A juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988). “Clear and convincing evidence” is “ ‘[e]vi-dence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ”, L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6-11-20(b)(4)). The juvenile court’s factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct. R.B. v. State Dep’t of Human Res., 669 So.2d 187 (Ala.Civ.App.1995). Furthermore, when the juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence. D.M. v. Walker Cnty. Dep’t of Human Res., 919 So.2d 1197, 1210 (Ala.Civ.App.2005).
The termination of parental rights is governed by Ala.Code 1975, § 12-15-319. That statute provides, in part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.
“(4) Conviction of and imprisonment for a felony.
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care *439 agencies leading toward the rehabilitation of the parents have failed.
“(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
§ 12-15-319(a).
The mother was incarcerated in 2008, after she was charged with manufacturing a controlled substance. She pleaded guilty to the charge and was sentenced to a 10-year period of incarceration, which was suspended, and 3 years of probation. The mother had remained in jail while her criminal case was pending, and she was released from incarceration on October 29, 2009. After her release from incarceration, the mother said, the mother and her fíancé, C.M., lived with his family for a short time and then began renting a mobile home in Falkville where they have lived since December 2009. The mother, who was 41 at the time of trial, testified that C.M., who was 52 at the time of trial, is disabled and had criminal charges pending against him at that time. Although the mother was not aware of the exact character of C.M.’s criminal charges, she said that she thought that C.M.’s criminal charges related to drug offenses and noted that he had been to court on the charges and was currently required to take drug screens. She also testified that C.M. was a good man and that his grandchildren visited “all the time.” She further testified that he loved the children. The mother testified that she became employed at Huddle House in December 2009 and that she was still working there full time at the time of trial.
The mother testified that she has been in contact with the children regularly since her release from prison, and she testified that, since April 2010, she had spoken to the children every day by telephone. She admitted that she did not manage to visit the children every week, but she said that she did visit them about every other week; she said that her work schedule and the distance between Falkville and Decatur sometimes interfered with her ability to visit the children as often as she would like. The mother testified that she had paid the maternal grandparents $93 in February 2010 and $80 in March 2010; however, she admitted that she had paid no other child support since the entry of the 2008 judgment. The mother admitted that she was unable to take custody of the children at the time of the trial; she said that she would need a few months, and perhaps as many as six, before she would be in a position to provide for the children.
The father testified that in 2008 he had been incarcerated for 19 months on 2 drug-manufacturing charges. He said that he had been “clean” for two and a half years. He also said that he had taken and passed four or five drug screens since his release from incarceration in July 2010. The father confirmed that he would be released from “community corrections,” a form of probation, in July 2012.
The father said that he had been placed on work release in May 2010, after which, he said, he had exercised the opportunity to make telephone calls to the children every week. He said that he had continued weekly telephone visitations, in accordance with the maternal grandmother’s re *440 strictions, since that time. According to the father, he spoke with all three children during telephone visitation. Since his release from incarceration in July 2010, said the father, he had visited the children three times in the home of the maternal grandparents. In addition, however, he said that he had attended a few football games at which the oldest child cheered, some school events, and some gymnastics events; he said that he was permitted by the maternal grandparents to visit with the children at those events.
The father testified that he had been injured in a work-related accident and that he had had back surgery in 2006. He testified that his doctors had told him that he was unable to work. He said that he thought that there was something he could do despite his work-related back injury; at the time of trial, he was pursuing a work rehabilitation or retraining program at Calhoun State Community College. In addition, the father testified that he was participating in a program called the Fatherhood Program or the Parenthood Program to help him learn to be a better father.
The father admitted that he had not paid the maternal grandparents any child support. He said that he had not been ordered to pay child support in the 2008 judgment. In addition, the father said, he had not been employed since 2006 and had been in prison for 19 months. The father said that he had received a $10,000 settlement as a result of his workers’ compensation claim; he said that he had used the money to pay bills that he had incurred after his work-related accident and to find a place to live. He stated that he had offered money to the maternal grandmother in the past but that she had told him the children had everything they needed.
The father testified that he would be able to take the children home and provide for them because his fiancée, J.D., earned sufficient income, i.e., $11 per hour, to provide for the children, even though she has two children of her own for whom she must provide. J.D. testified that she and the father had been engaged for four years and that he had lived with her for those four years when he was not incarcerated. She testified that the home in which she lives with the father and her own two children, a three-bedroom home, is sufficiently large to provide space for three more children. J.D., who testified that she was divorced, said that she had always had custody of her children. According to J.D., she paid all the bills with her employment earnings; the father had never been employed during the time she had known him.
The maternal grandmother testified that neither parent had paid child support at any time since the children were placed in her care other than when the mother had given her $90 one time. The maternal grandmother said that both the mother and the father had telephoned the children on a weekly basis; she testified that she had specifically told the father not to call more than once per week. According to the maternal grandmother, she did not allow the children to telephone either parent, despite the oldest child’s request that she be permitted to do so. Although both the parents had visited, explained the maternal grandmother, the father had done so only twice since his July 2010 release from incarceration and the mother’s visits were irregular.
According to the maternal grandmother, the mother had begun visiting with the children after her release from incarceration in late 2009; however, the maternal grandmother explained that the mother had “no clock timing” and that she would periodically call to set up a visit and that, sometimes, she would not show up for the *441 visit she had arranged. The mother’s visits, said the maternal grandmother, lasted anywhere from 10-15 minutes to an hour. The mother had, however, spent the night at the maternal grandmother’s home the week before the trial when the maternal grandmother had had surgery; the mother had assisted the maternal grandfather with getting the children ready for and to school the next morning.
The maternal grandmother said she had allowed the mother to take the children on an overnight visit to the mother’s home on one occasion. The maternal grandmother said that the mother had given the maternal grandmother telephone numbers to reach the mother but that, when she had tried to contact the mother to check on the children that evening, no one answered. The maternal grandmother said that she had been very concerned about the children’s well-being all night and that she had tried again to contact the mother in the morning, to no avail. The maternal grandmother said that she did not know where the mother lived. According to the maternal grandmother, one of the children had contacted her to inform her that they were returning home, and the children were returned home safely from that visit. The mother testified, however, that the maternal grandmother had her address. She also testified that she had been unaware that the maternal grandmother had telephoned to check on the children; she said that she and the children had gone on walks in the woods near her home during the visit.
When questioned about why she wanted to terminate the parental rights of the mother and the father, the maternal grandmother testified that she did not want either parent to be able to get custody of the children. She explained that she knew that she had custody and that the children would remain in her custody until either the mother or the father proved to a court that he or she could take care of the children and convinced that court to return the children to his or her custody. The maternal grandmother also admitted that the 2008 judgment permitted her to exclude the mother and the father from the children’s lives if she thought it was necessary. The maternal grandmother said that she was also planning ahead for a time after which, she said, she would not be able to provide insurance for the children unless she had adopted them. The maternal grandmother said that the children had stability in a good environment and that she wanted to adopt the children. Furthermore, the maternal grandmother explained, both parents had been involved in drugs, which, the maternal grandmother said, concerned her because of the possibility that the parents would resume their drug use. She said that she might be more confident of their sobriety had they each been “clean” for five years instead of only two. The maternal grandmother said that she would possibly let the parents visit the children again at some later date after the termination of their parental rights.
The maternal grandmother admitted that the mother had changed and had been trying to improve her circumstances. According to the maternal grandmother, the mother had not used drugs since being released from incarceration. The maternal grandmother testified that she was very proud of the mother. The maternal grandmother said that she knew the mother loved her children; the maternal grandmother further stated that she wanted the children to love the mother.
When asked what plans she had for the children in the event of death of both maternal grandparents, the maternal grandmother testified that she and the maternal grandfather intended to make a *442 will and set up a trust for the children’s education. She also said that the children’s uncle, who has no children of his own, would possibly be made the children’s guardian. According to the maternal grandmother, she would make sure that the children received an education and that they would stay “on the right track.”
The evidence concerning the children established that they are all well adjusted and well cared for by the maternal grandparents. The oldest child is in the seventh grade, is an A-B student taking advanced classes, and is involved in student council and cheerleading at her school. The middle child is also an A-B student in the fourth grade; she is involved in sports. The youngest child, who is a first grader, attends a magnet school and is very bright; the maternal grandmother said that she loves art and that she is learning to play chess. The maternal grandmother testified that she knew it would upset the oldest child if the parents’ rights were terminated and the parents could no longer contact her.
The parents described their visits with the children as good and positive. The mother explained that she loved the children and that they were her life. She said that her overnight visit with the children had gone well; she said that they had gone on walks in the woods near her home and had colored pictures.
According to the father, the two younger children were upset when he was unable to attend a football game because they had been looking forward to seeing him at that game. The father said that he spoke with all three of his children about their schoolwork and their activities when he spoke with them by telephone. He also said that he sometimes corresponded with the oldest child via an online social-networking Web site. Further, the father testified that he had made certain to stress to the oldest child that she was not to correspond with him via the Internet unless the maternal grandmother had expressly approved of the contact; the father said that he respected the maternal grandmother and that he worked within her boundaries while reestablishing his relationship with his children.
On appeal, the mother first argues that the juvenile court failed to reference the specific subparts of Ala.Code 1975, § 12-15 — 319(a), and to recite the facts underlying them, upon which it based its conclusion that the children were dependent and that termination of parental rights was warranted. The mother also argues that the evidence at trial did not support the termination of her parental rights because, she says, there was no egregious situation requiring termination in the present case and the maternal grandparents had not proved that no less drastic alternatives to termination existed. This second argument is premised on the fact that the maternal grandmother testified that the children were already in a stable placement in which they were thriving and on evidence indicating that the mother was improving her circumstances; based upon that evidence, the mother maintains that termination of her parental rights is not warranted at the present time and in the present circumstances. Essentially, the mother’s argument is that, in this situation, the status quo should be maintained. We agree with the mother and find this second argument dispositive of her appeals. Accordingly, we pretermit discussion of her first argument. See Favorite Market Store v. Waldrop, 924 So.2d 719, 723 (Ala.Civ.App.2005) (stating that this court would pretermit discussion of further issues in light of dispositive nature of another issue).
The evidence established that the mother has not been a parent to the children *443 since 2006, when they were removed from her custody after she left two of them in the care of her neighbors, who apparently molested them. Although the mother’s use of drugs led to a 2008 conviction for manufacturing a controlled substance, for which she had spent time in jail awaiting the court’s acceptance of her plea and sentencing, she was fortunate enough to have had her 10-year sentence suspended; the mother was still on probation at the time of trial, and she was compliant with her probation in all respects. She had located and maintained employment and had established what appeared to be a stable residence since her release from incarceration. The mother’s failure to pay child support even after she became employed is troubling; however, in light of the maternal grandmother’s comments indicating that she did not need child support from the parents in order to provide for the children, we cannot see how that failure of the mother, considered together with the positive improvements the mother had made, is sufficient to warrant a termination of the mother’s parental rights in this particular situation.
The mother testified that she was not able, at the time of trial, to provide a home for the children; she said that she was not seeking custody of the children and that the children were well cared for by the maternal grandparents. The mother simply desired that she be allowed to continue to visit with the children and develop her relationship with them as she continued to improve her circumstances, which, she said, would take at least several months. The evidence at trial established that the mother loved the children and that the children loved the mother. In addition, the maternal grandparents were not adverse to the mother’s having a continued relationship with the children.
We realize that we have rejected the argument that maintaining the status quo would be a viable alternative in many cases.
“[W]e note that we have previously rejected [maintenance of the status quo as a viable alternative] when grounds for termination exist and the situation is such that, in the foreseeable future, reunification will not be possible. See KA.P. v. D.P., 11 So.3d 812, 820 (Ala.Civ.App.2008) (rejecting maintenance of the status quo when it appeared that potential reunification would be at least 10 years in the future and commenting that, in order to achieve stability and continuity for children, ‘appellate courts generally hold that maintaining an indefinite custody arrangement with a third party is not in the best interest of the child’); B.J.C. v. D.E., 874 So.2d 1109, 1118 (Ala.Civ.App.2003), overruled on other grounds, F.G. v. State Dep’t of Human Res., 988 So.2d 555 (Ala.Civ.App.2007) (rejecting the father’s argument that ‘maintaining the situation the children had been in for the six years before the termination hearing by leaving them to be raised by family members’ was a viable alternative to termination when the father had failed to consistently support or visit with the children and his situation was unlikely to change in the foreseeable future); A.N.S. v. K.C., 628 So.2d 734, 735 (Ala.Civ.App.1993) (rejecting the maintenance of the status quo as an alternative to termination and noting that the father was expecting to be released from prison in seven years but that ‘[t]he maternal aunt and uncle were willing to adopt the children to give them a feeling of permanency and security’).”
L.T. v. W.L., 47 So.3d 1241, 1249 (Ala.Civ.App.2009). In a case such at this one, where the children have been placed in the permanent custody of a relative, we are *444 not concerned with “an indefinite custody-arrangement with a third party” or a lack of stability for the children. The children are in a stable and loving placement. However, the evidence is clear that the children and the mother have a relationship that both the children and the mother desire to preserve; the maternal grandmother said that the oldest child would be upset if she were told that she could no longer see or speak with her mother. In addition, the maternal grandmother herself testified that she might well let the mother have visitation with the children even after termination of the mother’s parental rights, indicating that she, too, desires to maintain for the children some connection to the mother.
We are especially mindful that the root of the maternal grandparents’ desire for termination in this case appears to be the desire to be able to adopt the children for purposes of providing insurance coverage to them in the future. Although we commend the maternal grandparents for their obvious love for the children and their careful planning for the future, we cannot agree that the parental rights of the mother should be terminated for such a reason. We therefore agree with the mother that maintaining the status quo is a viable alternative to termination of the mother’s parental rights in this particular case. Accordingly, we reverse the juvenile court’s judgments insofar as they terminate the parental rights of the mother.
The father first challenges the judgments terminating his parental rights by arguing, similarly to the mother, that the juvenile court committed reversible error when it failed make “articulable findings of fact necessary to support its judgment[s].” The father also makes a second challenge to the juvenile court’s judgments — that the evidence did not support a termination of parental rights because the only evidence concerning the ability to parent presented to the juvenile court centered on financial ability and the failure to pay child support. As was the case with the mother’s appeal, we find the father’s second argument dispositive, and we will pretermit discussion of his first argument on appeal. See Waldrop, 924 So.2d at 723.
One of the grounds that the juvenile court is to consider when making the difficult decision whether to terminate parental rights is whether the parents have financially supported the children. § 12-15-319(a)(9). The evidence at trial supported the conclusion that the father had not supported the children since 2006 and the conclusion that the father could not currently manage to support the children without assistance from his fiancée, J.D., who earns only $11 per hour and has two children of her own for whom she must provide. The father was unemployed and had yet to be awarded disability benefits based on a work-related injury that his doctors had told him rendered him unable to work; however, he was seeking training for a new trade, stating that he thought he could work at some trade despite his injury. The father may not have supported the children since 2006; however, the record discloses a basis for the father’s failure to support the children — his unemployment due to a debilitating work-related injury and his incarceration.
In addition, the failure of the father to pay support is, alone, insufficient in this particular case to warrant termination of the father’s parental rights. Like the evidence concerning the mother, the evidence concerning the father indicated that, after his release from incarceration, he has made and is continuing to make improvements to his circumstances. He has a stable residence with his fiancée of four years, he has visited with the children by telephone and in person as regularly as permitted and in compliance with the di *445 rectives of the maternal grandmother, the children enjoy his visits and desire a relationship with the father, and the father loves his children and desires to maintain his relationship with them. Because we have concluded that maintaining the status quo is an appropriate and viable alternative to the termination of the rights of the mother in the present case, we further conclude that the termination of the father’s parental rights was unwarranted in these circumstances. Accordingly, we reverse the juvenile court’s judgments insofar as they terminated the parental rights of the father.
REVERSED AND REMANDED.
PITTMAN and MOORE, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.
BRYAN, J., concurs in the result, with writing.