THOMAS, Judge.
In 2006, B.C. (“the mother”) consented to a judgment of the Jackson Juvenile Court placing A.B. and A.M. (“the children”) in the custody of M.A. and A.A., the children’s maternal great-aunt and her husband (referred to collectively as “the custodians”).[1] R.H.M. and H.R.M., the maternal great-uncle and his wife (referred to collectively as “the noncustodial relatives”), were awarded visitation with the children every Thursday from 8:00 a.m. to 8:00 p.m. and alternating weekends from Friday at 5:00 p.m. to Sunday at 8:00 a.m. The record does not indicate the spe *200 cific visitation rights afforded the mother; however, M.A. testified that “it’s in the papers that she can come and visit.”
In April 2011, the custodians sought to adopt the children. To that end, they filed petitions seeking the termination of the parental rights of the mother to the children in the DeKalb Juvenile Court.[2] Those petitions also sought the termination of the visitation rights awarded to the noncustodial relatives. The mother answered the petitions and filed separate petitions seeking custody of the children. The noncustodial relatives filed a petition to intervene and a complaint in intervention in each action, seeking custody of the children or, at least, a continuation of their visitation rights. The juvenile court permitted the noncustodial relatives to intervene; it also consolidated the actions for trial.
After several continuances, the actions were tried on August 14, 2012. M.A. testified that the mother had not consistently visited the children after late 2008, when the mother had resumed her relationship with the father of one of the children, who, the custodians believed, had abused the older child. M.A. characterized the change in the relationship between the mother and the custodians as being like “we became the enemy” and said that it had become more of a battle between the mother and M.A. instead of a cooperative relationship to benefit the children. M.A. further testified that the mother had not paid child support or provided financial support for the children until the custodians sought a child-support order; M.A. testified that the mother had not been current on her child-support payments at the time the termination petitions were filed, but she admitted that the mother might have been current on her payments at the time of trial.
M.A. testified that she and A.A. were seeking to adopt the children to provide them stability. She said that the children would be entering the second and fourth grades and that the younger child made “straight A’s” and that the older child made “A’s” and one “B” the previous school year. Although the children were performing well academically, she said that it was difficult for the children to “go back and forth” in a situation where they were being told “negative, negative, negative.” According to M.A., the noncustodial relatives would make disparaging comments about the custodians to the children. She admitted, however, that she might have made disparaging comments about the noncustodial relatives and about the mother and that, at times, she had questioned the children about what was said and done when they visited the noncustodial relatives. M.A. admitted that that behavior had been inappropriate and stated that she had discontinued the practice. She described the children’s lives as being a “roller coaster ride.” M.A. denied that she wanted to “completely wipe the mother from the children’s lives”; however, the petitions for termination of parental rights stated that the custodians “realize that ... the mother will be giving up any and all benefits of a relationship with the minor child[ren] and [she] will never be entitled to any visitation with the minor child[ren], nor participate any further in [their] li[ves].”
Regarding the request that the noncustodial relatives’ visitation rights be terminated, M.A. explained that the visitation rights granted under the 2006 judgment had begun presenting difficulties for the custodians and the children. M.A. said that the Thursday visitations, which were exercised from after school until 8:00 p.m. *201 on Thursdays during the school year, prevented the children from being involved in extracurricular activities because they could not attend Thursday practices. She also noted that alternate-weekend visits would interfere with activities that might require the children to participate on the weekends. According to M.A., the communication between the custodians and the noncustodial relatives was nonexistent. She explained that it would not be possible to “set up anything” regarding transportation to practices or attendance at activities because of the lack of meaningful communication between the parties. M.A. also testified that the children acted differently when they returned from visitation; she commented that the older child was more aggressive toward the younger child and complained that she had been treated differently by the noncustodial relatives, while the younger child cried “a lot” more. M.A. further testified that she had heard that the noncustodial relatives had told the children that the custodians were not Christians and that they were “demon possessed”; she also said that the noncustodial relatives had tried to prevent the custodians from receiving a “ministry license.” However, although she testified that she was concerned about the children’s emotional health because they were required to “go back and forth,” M.A. said that she had no real concerns regarding the children’s safety when they were visiting with the noncustodial relatives.
A.A. testified that he works in Chattanooga, Tennessee. Like M.A., he testified that he had no intention of cutting the mother out of the children’s lives completely; he said that she could still visit even after her parental rights were terminated. He also said that he had no desire to end all visits with the noncustodial relatives either; he stated that he would like to be able to use “common sense” when determining when the noncustodial relatives could visit. He said that the mother and the noncustodial relatives were family and that “you can’t take someone out of someone else’s life completely and entirely without there being devastation. That would be horrible.” Like M.A., he did note, however, that the children’s behavior changed after visitation with the noncustodial relatives; he said that teachers had reported that the children’s behavior changed on Fridays. A.A. also testified that the older child had reported being called a “GD little B” at a visit. He admitted that the parties needed to improve their relationship and their communication. He explained that it would take effort from all parties to effectively do so.
R.H.M. testified that he and H.R.M. were awarded visitation in the 2006 judgment. He said that, although the communication between the parties was nonexistent at first, it had improved for a few years. However, he explained, when a dispute arose over the custodians refusing to allow the children to visit at Christmas, despite the fact that Christmas fell on a visitation weekend, he told the custodians that he did not like how he and H.R.M. were being treated. He said that M.A. became upset after that discussion and that the communication between the parties disintegrated. R.H.M. admitted that he had, at times, made disparaging statements about the custodians in the presence of the children and that he had also sometimes inquired of the children what was being said and done at the custodians’ home; however, he testified that he and H.R.M. had realized such conduct was inappropriate and that they had discontinued those practices.
R.H.M. testified that he and H.R.M. desired custody of the children because they would promote the involvement of the mother, who, he said, had become more interested in being involved with *202 the children. According to R.H.M., the custodians’ relationship with the mother prevented her from being able to maintain a relationship with the children. He said that M.A. was his sister and that she seemed determined to cut off the children’s “family ties,” starting with their relationships with the mother and with him and H.R.M. He contended that he and H.R.M. could provide the children a stable home and also foster then* relationships with the mother and with the custodians.
Regarding the ability to handle transporting the children to and from practices or activities, R.H.M. said that he and H.R.M. would have no problem making sure the children were transported to wherever they needed to be; he noted that he and H.R.M. lived only 20 to 25 minutes away from the custodians. He said that he would be willing to exchange schedules and to communicate, although perhaps in a limited manner, with the custodians regarding the children. He denied having tried to interfere with the custodians’ “ministry license,” and he denied having called the older child a “GD little B.” When questioned regarding another incident in which the younger child had reported that he had stated that he wanted to kill the custodians, he explained that he had been upset over the pending action, that he had made some statement that may have contained profanity indicating that he was fed up with the matter, that he had left his house and gone into his yard, that he had discovered that his dog had chewed through some wires on his lawnmower, and that he had then returned to the house and told H.R.M. that “he would like to kill that dog.” He said that it was likely that the younger child had overheard some of the statements and that he had been confused regarding the threat to kill. R.H.M. denied having anger-management issues but admitted that, at times, he did become angry.
R.H.M. testified that the mother visited with the children when the children were visiting with him and H.R.M. He explained that the mother would come to their home at times and that, at other times, they would travel to Chattanooga to provide the mother visitation with the children. According to R.H.M., the mother visited with the children regularly. He said that the mother loved the children and that they loved her. He described the younger child as “glowing” when he saw the mother. He further opined that the mother’s rights should not be terminated because it would not be in the children’s best interest.
The mother testified that she lives in Chattanooga with her parents, both of whom suffer from medical issues. She said that her brother also lives with her and her parents in the three-bedroom house. The mother reported that she worked at a “call center” and that she had worked there for six months. She testified that she loved the children, that she would like the children to be returned to her custody, and that they could live with her at her parents’ home. However, upon cross-examination, the mother admitted that the 2006 judgment prohibited the children from being in the presence of her father and her brother.
The mother admitted that she had had limited contact with the children between late 2008 and 2011, when the petitions to terminate parental rights were filed. The mother said that communication between her and the custodians had broken down, resulting in difficulty arranging visitation. She said that she had been told that the custodians sometimes did not answer her telephone calls even when they were at home when she telephoned. She also complained that M.A. would refuse to get on the telephone when the mother asked to *203 speak to her and that M.A. would tell the older child to tell the mother that M.A. was “busy.” However, the mother said that she had been visiting the children when the noncustodial relatives had the children for visitation. The mother testified that she objected to the custodians’ adopting the children because they would change the children’s last names and because they wanted to cut her out of their lives. She further testified that she would be willing to allow the noncustodial relatives to adopt the children because they would agree not to change the children’s last names and would allow her to continue to be involved in their lives.
The juvenile court entered judgments denying the mother’s custody petitions and terminating the parental rights of the mother to the children.[3] Those judgments further denied the noncustodial relatives’ petitions seeking custody and terminated specified visitation for the noncustodial relatives; the judgments permitted visitation between the children and the noncustodial relatives at the discretion of the custodians. Both the mother and the noncustodial relatives timely appealed.[4]
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004). A juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988). “Clear and convincing evidence” is “ ‘[evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala. Code 1975, § 6 — 11—20(b)(4)); see also Ex parte Mclnish, 47 So.3d 767 (Ala.2008) (explaining standard of review of factual determinations required to be based on clear and convincing evidence). A juvenile court’s factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct. R.B. v. State Dep’t of Human Res., 669 So.2d 187 (Ala.Civ.App.1995). Furthermore, where a juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence. D.M. v. Walker Cnty. Dep’t of Human Res., 919 So.2d 1197, 1210 (Ala.Civ.App.2005).
The mother argues on appeal that the juvenile court erred in terminating her parental rights because, she says, the custodians failed to present clear and convincing evidence that no viable alternative to termination of those rights was available. The mother specifically argues that award *204 ing custody or visitation to the noncustodial relatives could serve as a viable alternative to the termination of her parental rights. She posits that they should have been allowed to supervise visitation or that they should have been awarded custody so that they could assist in preserving the mother’s relationship with the children.
As this court has explained, an appellate court considering an appeal from a judgment terminating parental rights
“‘must review not only whether [the children] remain[] dependent, but also whether the [juvenile] court considered and rejected, based on clear and convincing evidence, the possible viable alternatives before terminating [the mother’s] parental rights.’” See Ex parte Ogle, 516 So.2d [243] at 247 [ (Ala.1987) ] (holding that the party attempting to terminate a parent’s parental rights has the burden to prove, by clear and convincing evidence, that there are no viable alternatives); J.D. v. Tuscaloosa County Dep’t of Human Res., 928 So.2d 303, 307 n. 1 (Ala.Civ.App.2005) (“When a nonparent such as DHR seeks to terminate parental rights, it must establish by clear and convincing evidence not only that the children are dependent but also that no viable alternative to termination of the parental rights exists.”); D.O. v. Calhoun County Dep’t of Human Res., 859 So.2d [439] at 443 [ (Ala.Civ.App.2003) ] (“A nonparent who seeks to terminate a parent’s parental rights must prove by clear and convincing evidence that the children are dependent and that there are no viable alternatives to the termination of parental rights.”); AM. v. Lamar County Dep’t of Human Res., 848 So.2d 258, 259 (Ala.Civ.App.2002) (same). The need to consider all viable alternatives is rooted, in part, in the recognition that the termination of parental rights is a drastic step that once taken cannot be withdrawn and that implicates due process. Thus, the Beasley two-pronged test is designed to protect the welfare of thé child while also protecting the rights of parents. [Ex parte ] Beasley, 564 So.2d [950] at 952 [ (Ala.1990) ]. The requirement that clear and convincing evidence support the determination to terminate parental rights is based on the need to protect the due-process rights of the parents. Santosky v. Kramer, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The party seeking to terminate a person’s parental rights thus has the burden of producing clear and convincing evidence that there are no viable alternatives to the termination of parental rights. Ex parte Ogle, 516 So.2d at 247; see also K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003) (holding that the party seeking to terminate the parental rights of another bears the burden of proving that termination of those rights is the appropriate remedy).
C.E.W. v. P.J.G., 14 So.3d 166, 170-71 (Ala.Civ.App.2009) (quoting Ex parte T.V., 971 So.2d 1, 8-9 (Ala.2007)) (some emphasis omitted).
As the mother effectively argues, the record does not contain clear and convincing evidence demonstrating that no viable alternative to the termination of the mother’s parental rights existed. She points out that awarding custody or visitation to the noncustodial relatives is a viable alternative to termination of her parental rights in the present case. Although the juvenile court denied their petitions seeking custody, on which the noncustodial relatives bore the burden of proof, the custodians had the burden of proving by clear and convincing evidence that no viable alternative existed to the termination of the mother’s parental rights. The evidence presented at trial indicates that the children have visited with the noncustodial *205 relatives nearly every Thursday and every other weekend since 2006. M.A. said she had no safety concerns about the visits, although she was concerned about the emotional toll on the children caused by having to “go back and forth.” Both sets of relatives admitted that some disparaging comments had been made in the presence of the children, and both sets admitted to asking the children to report on what was said and done when they were with the other relatives; however, both said that they had discontinued those practices. The evidence indicated that the children performed well in school, and, although there was some vague testimony that the children “act out” after visits, neither custodian explained what behaviors the children exhibited other than to say one cried more and that one was more aggressive toward the other because of what might have been perceived as favoritism. The record further reflects that the mother loves the children and that they love the mother; the record also reveals that the mother visits the children regularly with the aid of the noncustodial relatives, who, based on R.H.M.’s testimony, desire to assist the mother in maintaining her relationship with the children.
“ ‘Clear and convincing evidence’ is ‘[e]v-idence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M., 840 So.2d at 179 (quoting Ala.Code 1975, § 6 — 11— 20(b)(4)). We conclude that the evidence at trial does not reach the level of clear and convincing evidence demonstrating that no viable alternative to termination of the mother’s parental rights exists. The evidence indicates that the children are doing well in the custody of the custodians and that they have close bonds with the mother and with the noncustodial relatives.
No tendency of the evidence supports the conclusion that no alternative involving the custodians and the noncustodial relatives would be a viable method to preserve the children’s relationship with their mother and still provide a safe and stable living arrangement for the children. See L.R. v. C.G., 78 So.3d 436, 444 (Ala.Civ.App.2011) (reversing a termination of a mother’s parental rights and holding that a viable alternative to termination of her parental rights existed when the mother and the children had a relationship both the mother and the children desired to preserve, the children were in a stable relative placement, and one of the custodians had testified that the mother could visit the children even after her parental rights were terminated). Accordingly, we reverse the judgments terminating the mother’s parental rights.
The noncustodial relatives appeal the judgments insofar as they denied their petitions seeking custody of the children and terminated the award of specified visitation to them. The noncustodial relatives filed petitions seeking custody of the children, in which they asserted that the children’s best interests would be better served if custody were modified. Once a juvenile court has placed a dependent child into the “permanent” custody of a proper caregiver, the dependency of the child ends and any further change of custody is governed by the standards set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984). See Ex parte J.P., 641 So.2d 276, 278 (Ala.1994) (applying the McLendon standard in a custody dispute between two sets of relatives when one set of relatives had been awarded custody under a prior judicial order). Thus, the noncustodial relatives were required to meet the McLendon standard in order to be entitled to a modification of the custody of the children. As *206 our supreme court reaffirmed in Ex parte Cleghorn, 993 So.2d 462, 466-67 (Ala.2008):
“In Ex parte McLendon, we held that the trial court cannot order a change of custody ‘ ‘unless [the party seeking the change of custody] can show that a change of the custody will materially promote [the] child’s welfare.’ ’ 455 So.2d at 865 (quoting Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1947)). We noted in Ex parte McLendon that ‘[i]t is important that [the party seeking the change in custody] show that the child’s interests are promoted by the change, i.e., that [the party seeking the change in custody] produce evidence to overcome the ‘inherently disruptive effect caused by uprooting the child.’ ’ 455 So.2d at 866.”
Our supreme court has also stressed that “[t]he McLendon standard is a ‘rule of repose,’ meant to minimize disruptive changes of custody because this Court presumes that stability is inherently more beneficial to a child than disruption.” Ex parte Cleghorn, 993 So.2d at 468. As noted above, the record contains evidence indicating that the children make good grades and are doing well in the custody of the custodians. Nothing in the record would support the conclusion that the children’s best interest would be served by modifying custody and removing the children from the home of the custodians. Accordingly, we affirm the juvenile court’s judgments insofar as they denied the noncustodial relatives’ custody petitions.
The noncustodial relatives also appeal the juvenile court’s judgments insofar as they terminated their rights to specific visitation. In contravention of Rule 28(a)(10), Ala. R.App. P., the noncustodial relatives have not presented authority for their argument that it was not in the children’s best interest for their specific visitation rights to be terminated; because we are not required to perform a party’s legal research, the failure to present authority for an argument often results in a determination that the argument was waived and that the judgment should be affirmed on that issue. White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1058 (Ala.2008). (“Rule 28(a)(10) requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party’s position. If they do not, the arguments are waived.”); Spradlin v. Birmingham Airport Auth, 613 So.2d 347, 348 (Ala.1993) (quoting Sea Calm Shipping Co., S.A. v. Cooks, 565 So.2d 212, 216 (Ala.1990)) (“ ‘Where an appellant fails to cite any authority for an argument, this Court may affirm the judgment as to those issues, for it is neither this Court’s duty nor its function to perform all the legal research for an appellant.’ ”). Although we may sometimes overlook such an omission, we typically do so when the issue has been adequately addressed by the appellee and the appellee would not be prejudiced by our consideration of the issue. See Kirksey v. Roberts, 613 So.2d 352, 353 (Ala.1993) (explaining that an appellate court may consider an argument that is not compliant with Rule 28(a)(10) if the court is able to adequately discern the issues presented); Bishop v. Robinson, 516 So.2d 723, 724 (Ala.Civ.App.1987) (explaining that an appellate court may consider an argument that is not compliant with Rule 28(a)(10) when the appellee adequately responds to the issues raised by the appellant in brief despite the noncompliance); and Thoman Eng’rs, Inc. v. McDonald, 57 Ala.App. 287, 290, 328 So.2d 293, 295 (Civ.1976) (explaining that an appellate court may consider an argument that is not compliant with the predecessor to Rule 28(a)(10) when the argument “has been raised in a manner which is fair to all concerned”). The fact that the argument may well have merit does not change the *207 fact that an appellant is required to adequately argue an issue before the court. In the present case, we have not been favored with a brief from the custodians. Thus, we are constrained to affirm the juvenile court’s judgment insofar as it terminated the specific visitation rights of the noncustodial relatives because of their failure to provide the court with legal authority supporting reversal.
2111247 — REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, MOORE, and DONALDSON, JJ., concur.
2120407 — AFFIRMED.
THOMPSON, P.J., and PITTMAN and DONALDSON, JJ., concur.
MOORE, J., concurs in part and dissents in part, with writing.

. The record does not contain the 2006 judgment; however, the parties are in apparent agreement regarding its provisions, and they testified regarding those provisions at trial.

. The petitions also sought termination of the parental rights of the fathers of the children.

. The judgments also terminated the rights of the children’s respective fathers. Neither father has appealed the judgment terminating his parental rights.

. The noncustodial relatives appealed the judgments to the DeKalb Circuit Court. However, because the record was declared to be adequate for appeal to this court, see Rule 28(A)(1)(a), Ala. R. Juv. P., the circuit court transferred their appeal to this court. Rule 28(d), Ala. R. Juv. P. We consolidated the noncustodial relatives' appeal with the mother’s appeal.