Rel: August 9, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2024

_____

### CL-2023-0828

_____

### P.G.

### v.

### J.H. and B.H.

_____

### CL-2023-0832

_____

### S.R.

### v.

### J.H. and B.H.

### Appeals from Walker Juvenile Court
### (JU-21-12.02)

FRIDY, Judge.

In these consolidated appeals, P.G. ("the father") and S.R. ("the mother") appeal from a judgment of the Walker Juvenile Court ("the juvenile court") terminating their parental rights to their child N.G. ("the child"). For the reasons set forth herein, we reverse the judgment and remand the cause to the juvenile court.

## Background

Two children were born of the mother and the father's relationship. The child who is not the subject of this action was in the custody of the father's sister. This action concerns the mother's and the father's parental rights to their child, N.G. ("the child"), who was born in February 2020.

On January 25, 2021, the Walker County Department of Human Resources ("DHR") placed the child in the care of B.H. and J.H. ("the custodians"), who lived in Haleyville with their two children, as part of a safety plan created because of the mother's and the father's struggles with substance abuse. Although the custodians were not related to the child, they knew him because they babysat the child for a short time

before DHR put the safety plan in place. On November 2, 2021, after a hearing, the juvenile court found the child to be dependent.

On October 11, 2022, after a dispositional hearing, the juvenile court found that the child remained dependent because, it said, the parents had not made sufficient efforts to reunify with the child, and it transferred custody of the child to the custodians. It also relieved DHR of further responsibility in the case. The juvenile court directed the father to pay child support in the amount of $200 per month, and awarded the mother and the father two hours of supervised visitation with the child on the first Saturday of each month.

On April 26, 2023, the custodians filed a petition to terminate the parental rights of the father and of the mother as to the child. The juvenile court held a trial on October 18, 2023, on their petition.

Testimony at the trial indicated that the mother had a history of illegal drug use and had overdosed twice. She testified that, in the three years before the trial, she had been arrested at least three times. She had previously pleaded guilty to felony chemical endangerment of a child, for which she was incarcerated from September 2022 to February 2023. She had also pleaded guilty to crimes, including possession of a controlled

substance and possession of drug paraphernalia, and she had been charged with promoting prison contraband, among other crimes.

The mother testified that she had been addicted to opioids and that in February 2023, soon after she had been released from jail, she had overdosed. Two days after, and because of this overdose, the custodians did not allow the mother to visit with the child on his birthday. On February 22, 2023, the mother entered Restoring Women Outreach Rehab in Cullman. The mother testified that while at this rehab, she completed parenting and anger-management classes. She said that she voluntarily left the rehab program on May 11, 2023, and entered the Lotus Recovery House on May 12, 2023. After being dismissed from Lotus Recovery House for several days in June 2023 for violating the program's rules and for using drugs, the mother returned to the program.

At the time of the trial, the mother continued to reside at the Lotus Recovery House, and she was in a recovery program from which she planned to graduate in the first week of November 2023. The mother's parental rights to two of her four children had already been terminated, and those children had been adopted. The mother testified that, after

completing her treatment program, she planned to live with the woman who had adopted the two children.

The mother did not take part in any DHR services and was not present for any court proceedings until the trial on the petition to terminate parental rights. At the time of trial, although she was not seeing a counselor, the mother testified that she was attending meetings concerning her sobriety and that she intended to continue attending them. She testified that she was on probation and would be required to complete "CRO and Community Corrections" after she left the Lotus Recovery House. If she did not comply with her probation requirements, the mother testified, she would go to prison, which was one of the reasons she had decided to enter rehab.

B.H., one of the custodians, testified that the mother reached out in February 2023, August 2023, and September 2023 to schedule visits. B.H. stated that the mother saw the child twice in 2022 and once in February 2023, under the supervision of the custodians. Each visit lasted approximately one- and one-half hours according to B.H. According to testimony, the mother called the child by FaceTime, a videoconferencing application, once while she was incarcerated. Prior to that video call, the

mother testified, she had not seen the child since she and the father were together, which had been before the DHR case had closed in October 2022. B.H. testified that while DHR was involved, the mother probably visited the child fewer than five times. She also testified that the mother did not reach out to her at any other time to inquire as to the child's wellbeing. J.H., the other custodian, testified that the mother had no relationship with the child and that, at her last visit, the child did not know who the mother was.

Although she was not ordered to, the mother had never paid any child support and had not provided any other items for the child aside from one Easter basket that she sent while she was incarcerated and several toys that the mother and the father had received when the child was born. The mother testified that she was employed at the time of trial.

At the time of trial, the father was living in Ozark after having recently relocated from Carbon Hill to get away from an environment that, he said, made it difficult for him to stop using drugs. The father testified that, from August 2022 until he moved to Ozark in May 2023, he had worked at a company called Repair Ninja earning $14 per hour. The father stated that he worked two to three days per week in that

6

position. He said that in June 2023, after his move to Ozark, he began working for a contractor making $17 per hour.

Evidence showed that the father had a history of substance abuse but, at the time of trial, he testified that he had been clean for approximately 175 days. He lived with his fiancée in Ozark, and he drove a vehicle that she owned.

The father testified that he regularly drug tested, although he was not ordered to do so. He said that he took a hair-follicle drug test on September 14, 2023, which covered the prior ninety days, and was negative. He testified that he had been clean since the end of May 2023, when he moved in with his fiancée, and was attending weekly sessions with a therapist in Ozark who provided substance-abuse counseling.

The record is somewhat unclear on how many child-support payments the father made after the juvenile court directed him to begin paying child support in its October 4, 2022, order. B.H. testified that the custodians had received only one payment of $200 from the father since the trial court awarded them custody of the child. The father stated that he made the payment that the custodians received by money order in July 2023 but that he also had made three additional payments

7

subsequently using an online portal through a system operated by the State. The father attempted to introduce as an exhibit a payment sheet that he said showed the three payments in August, September, and October 2023, but the trial court did not admit the exhibit. J.H. conceded that he never sent in a voided check to the State, so he was unsure whether more payments from the father were pending in the State's system.

The father was granted a hardship driver's license in June 2022 and paid approximately $6,500 in outstanding court and traffic fines to regain his driver's license. At the time of trial, he had a current, valid license, issued to him on September 1, 2023. He testified that he had paid all his outstanding fines by July 2023, after beginning his contractor job. The father testified that he would thenceforth be able to pay the monthly child-support payment of $200, in addition to monthly child-support-arrearage payments of $150, with the income from his new job.

The custodians and the father agreed that the father did not visit the child in February 2023, but the father testified that he did visit the child in November and December 2022 and then each month from January through September 2023, excluding February. B.H. testified

that the father's visitation was sporadic before April 2023, a characterization with which the father disagreed. B.H. also testified that in 2022, the father went for five months with no contact with the children. She stated that the father visited in October of 2022, and then did not visit again until May of 2023. The father testified that he called the child every Sunday, although, he said, the custodians did not always answer.

The father offered two exhibits containing messages between B.H. and him in February and March 2023. Those documents showed that, on February 17, 2023, the father texted B.H. at 8:26 a.m. saying that he had called to tell the child happy birthday. He received no response. The father then messaged B.H. on a social-media website at 2:33 p.m. on the same day, saying, "hey," and again received no response. On February 19, 2023, the father texted B.H. "hey" and received no answer. On March 1, 2023, he texted B.H., "6-7 pm tonight right?" B.H. responded that the child had a fever. The father attempted to reschedule, but B.H. responded that she did not know when they would next be available. The father next texted on March 13, 2023, and asked if he could visit the child. B.H. responded that she did not know why he did not visit on March 4, 2023. On March 15, 2023, the father texted B.H. to confirm where baseball

9

practice was being held that day so that he could see the child, who would be watching the custodians' children play. B.H. confirmed but later texted that the location had been moved and added a screenshot of the message moving practice. The next contact through messages took place on May 21, 2023, when the father called and the custodians did not answer.

The custodians both testified that prior to obtaining custody of the child in October 2022, the father appeared to have sometimes "shown up high" to visits with the child. However, they also testified that the father had not seemed intoxicated at any visit since the juvenile court awarded custody to the custodians and that he "appear[ed] to be better." J.H. testified that the father often did not arrive punctually to visits, and that this had been a consistent problem. The father agreed that he did sometimes ask to visit and did not arrive punctually but stated that he tried to reschedule if he was unable to go. J.H. testified that he had seen nothing in the month before the trial to indicate that the father was a danger to the child. He said that the father had visited with the child consistently each month since April 2023. B.H. said that the father had

called consistently each Sunday by phone or FaceTime since April 2023, which the father confirmed.

The father testified that he had a good bond with the child, that the child was always happy to see him at visits, and that the child loved him. He stated that he usually brought the child a gift or a toy and that they played during the visits. He said that he had completely changed his life and was ready, willing, and able to be a father to the child.

J.H. testified that the custodians intended to adopt the child if the trial court terminated the parents' parental rights but that they would be willing to continue maintaining custody of the child if the juvenile court did not do so.

On November 7, 2023, the juvenile court entered a judgment terminating the mother's and the father's parental rights. The juvenile court found that the mother had failed to provide for the needs of the child, had failed to participate in DHR services, had failed to pay any support for the child, and had failed to maintain consistent contact with the child. The juvenile court found that the father had failed to provide reasonable support for the child despite his ability to do so and that he had not maintained consistent communication with the child but had

11

increased his communication before approaching court dates. The juvenile court found that the mother and the father were unable and unwilling to discharge their responsibilities to the child and that the conduct that rendered them unable to care for the child was unlikely to change in the foreseeable future. The juvenile court also found that there were no viable alternatives to termination of the mother's and the father's parental rights that were consistent with the child's best interests. The mother and the father each filed a motion to alter, amend, or vacate the judgment pursuant to Rule 59, Ala. R. Civ. P., which were denied by operation of law. See Rule 1(B), Ala. R. Juv. P. The mother and the father appeal.

Standard of Review

This court reviews a juvenile court's judgment terminating parental rights by evaluating whether the judgment was supported by clear and convincing evidence. See J.H. v. Bibb Cnty. Dep't of Hum. Res., 261 So. 3d 1229, 1232 (Ala. Civ. App. 2018). Clear and convincing evidence is "'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness

of the conclusion.'" L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting § 6-11-20(b)(4), Ala. Code 1975); see also Ex parte McInish, 47 So. 3d 767,776 (Ala. 2008). This evaluation "requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt." L.M., 840 So. 2d at 179 (quoting § 6-11-20(b)(4)).

In reviewing a judgment terminating parental rights, an appellate court will review factual findings of the juvenile court based on ore tenus evidence with a "presumption of correctness" because the trial court had the benefit of "observing witnesses, including the mother, as they testified, and, therefore, [the juvenile court] was able to assess their demeanor and credibility." J.C. v. State Dep't of Hum. Res., 986 So. 2d 1172, 1195 (Ala. Civ. App. 2007). We review questions of law de novo. See J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011).

## Analysis

### The Father's Appeal

The father contends that clear and convincing evidence does not support the juvenile court's finding that grounds for terminating his parental rights exist. Specifically, he argues that there was insufficient

13

evidence from which the juvenile court could have been clearly convinced that, at the time of the trial, he was unwilling or unable to discharge his duties as a parent or that any condition that would preclude him from being able to care for the child would likely persist into the foreseeable future.

We begin with the established principle that parental rights are fundamental and that the termination of those rights "strikes at the very heart of the family unit." Ex parte Beasley, 564 So. 2d 950, 952 (Ala. 1990). Therefore, a court should terminate a parent's parental rights only "in the most egregious of circumstances." Id. at 952. When deciding whether to terminate parental rights, "the primary focus of a court ... is to protect the welfare of children and at the same time to protect the rights of their parents." Id. Because there is a "fundamental right to family integrity" the state may interfere with that right using only the "most narrowly tailored means available." J.B. v. DeKalb Cnty. Dep't of Hum. Res., 12 So. 3d 100, 115 (Ala. Civ. App. 2008) (plurality opinion).

When determining whether to terminate parental rights, a juvenile court must consider whether clear and convincing evidence supports the existence of at least one of the grounds for termination set forth in § 12-

14

15-319(a) Ala. Code 1975. The party moving for the termination must demonstrate that the parent is "unable or unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future." § 12-15-319(a).

Here, the juvenile court found that the father "failed to maintain consistent contact or communication with the minor child" and that the communication that he had had with the child was intermittent. § 12-15-319(a)(11). Specifically, the juvenile court found that from October 2022, when the custodians were awarded custody of the child, to January 2023, the father communicated with the child once a month, but that the father "did not have phone/video or in person contact with the minor child from February 2023 until May 2023."

The evidence regarding the father's attempts to see or communicate with the child during the fall and winter months of 2022 and early 2023 was disputed. B.H. testified that the father's visitation was sporadic before April 2023 and that from October 2022 to May 2023, the father did not visit. The father argues that he called the child every Sunday,

although the custodians did not always answer the telephone. He offered two exhibits containing messages between B.H. and him in February and March 2023 showing that he sent text messages to the custodians, including wishing the child a happy birthday, but that he received no response. He also presented unchallenged written communications that he had had with the custodians in which he checked on the child's well-being and in which he sought visitation with the child.

Additionally, the father argues that the undisputed evidence demonstrates that, from spring 2023 up until the trial in October 2023, he had consistently visited with the child each month and was maintaining both regular in-person visitation and "video chats" with the child. Other undisputed evidence showed that he would travel from his home in Ozark to baseball games in which the custodians' children were playing so that he could see the child. The custodians testified that the father worked with them to arrange visitations and telephone and video calls because everyone had busy schedules.

Based on the evidence presented, and being cognizant that it is not the role of this court to reweigh the evidence in determining whether to uphold or reverse the juvenile court's judgment, we conclude that there

16

is insufficient evidence from which the juvenile court could have been clearly convinced that the father was not maintaining or attempting to maintain contact or communicating with the child so as to warrant a termination of his parental rights and that its judgment as to this issue is plainly and palpably wrong.

The father also argues that that there was insufficient evidence for the juvenile court to have found that he failed to provide for the material needs of the child or pay a reasonable portion of support for the child although he was employed and able to do so. § 12-15-319(a)(9). This court has held that a parent's failure to pay child support although the parent is employed and regularly earning wages can, under certain extraordinary circumstances, be an insufficient basis for finding that that parent failed to provide financial support for the child. For example, in L.R. v. C.G., 78 So. 3d 436 (Ala. Civ. App. 2011), the father did not pay any child support to the custodians, despite receiving a substantial workers' compensation settlement payment, because "he had used the money to pay bills that he had incurred after his work-related accident and to find a place to live." Id. at 440. This court stated that "the failure of the father to pay support [was], alone, insufficient in this particular

case to warrant termination of the father's parental rights," noting that the father "ha[d] made and [was] continuing to make improvements to his circumstances." Id. at 444. See also K.G. v. J.T., 382 So. 3d 1257, 1261 (Ala. Civ. App. 2023) (holding that there was insufficient evidence for the juvenile court to terminate parental rights on the basis that the mother failed to pay child support in part because she had obtained a car and stable housing instead).

In this case, the father testified that he did not pay child support for a time because he instead paid approximately $6,500 in outstanding court and traffic fines so that he could regain his driver's license and avoid additional arrests. Additionally, the father testified that he made several payments after obtaining the higher-paying job working with the contractor and that he would be able to pay child support and his child-support arrearage in the future. Finally, the father testified that, after obtaining the higher-paying job, he had made child-support payments to the payment portal approved by the State. The custodians testified that they had not received the payments, but J.H. testified that he had not provided the documentation necessary for those payments to be credited to his account and that he did not know whether the payment center was

holding payments that he would receive when he supplied the proper documentation.

The evidence indicates that, since April 2023, the father had been making progress with building a stronger relationship with the child, maintaining a livelihood, ending his use of illegal drugs, and finding stability in his life. Additionally, the father's failure to pay child support occurred under circumstances that do not justify a termination of his parental rights. See L.R., supra. As a result, we conclude that clear and convincing evidence did not support the juvenile court's finding that there were sufficient grounds for terminating the father's parental rights.

The father next contends that there were viable alternatives including maintaining the status quo that the juvenile court should have considered before terminating his parental rights. We agree with the father and conclude that, even if there was sufficient evidence to support a ground for terminating his parental rights, clear and convincing evidence did not support the finding that there were no viable alternatives to terminating his parental rights.

When considering a termination of parental rights case, a court must consider whether alternatives existed that were "less drastic than

19

termination of parental rights … to protect the best interests of the child."

Ex parte Beasley, 564 So. 2d at 955. In this case, the undisputed evidence indicated that the father and the child had a good relationship and that he and the child loved each other. During the course of the litigation, he had obtained a higher paying job, had stopped taking illegal drugs, and had begun to make child-support payments after paying off his court fines. The custodians both testified that the father had made progress toward becoming more responsible since moving to Ozark. The father stated that he was ready, willing, and able to be a father to his child. The custodians testified that they would be willing to retain custody of the child regardless of whether the mother's and the father's parental rights were terminated.

Under the circumstances, we cannot say that the custodians presented clear and convincing evidence to establish that the facts of this case rise to the level of the egregious circumstances necessary to warrant a termination of the father's parental rights to the child, with whom he has established a loving relationship. Because the custodians have expressed their willingness to continue to raise the child in their home even if the father's parental rights are not terminated, we conclude that

20

maintaining the status quo, i.e., preserving the beneficial relationship between the father and the child while the custodians continue to provide the child with a safe and stable home, is an appropriate and viable alternative to terminating the father's parental rights. See A.B. v. Montgomery Cnty. Dep't of Hum. Res., 370 So. 3d 822, 831 (Ala. Civ. App. 2022). As a result, the juvenile court's judgment terminating the father's parental rights is due to be reversed.

### The Mother's Appeal

The mother contends that the juvenile court erred in denying her request for a hearing on her postjudgment motion. The mother argues that that there was probable merit to her motion and, therefore, that the failure to hold a hearing on the motion constituted reversible error. See Dubose v. Dubose, 964 So. 2d 42, 46 (Ala. Civ. App. 2007) (holding that "[w]hen there is probable merit" to a postjudgment motion, the error in failing to hold a hearing on it "cannot be considered harmless").

The mother argued in her postjudgment motion that viable alternatives to terminating her parental rights existed, including, she said, maintaining the status quo or transferring custody to the father and awarding her supervised visitation with the child. She specifically

21

requested a hearing on her motion. We have concluded that the judgment must be reversed and the cause remanded because, under the facts of this case, maintaining the status quo is a viable alternative to the termination of the father's parental rights. The decision allowing the father to retain his parental rights to the child may result in a different outcome as to whether there were viable alternatives to the termination of the mother's parental rights, even if clear and convincing evidence supported the juvenile court's finding that grounds existed for the termination of those rights. Therefore, on remand, the juvenile court should conduct a hearing on the mother's postjudgment motion to determine, among other things, whether a viable alternative exists to the termination of her parental rights in light of the father's retention of his parental rights. See, e.g., K.M. v. Houston Cnty. Dep't of Hum. Res., [Ms. CL-2023-0256, Jan. 5, 2024] ___ So. 3d ___ (Ala. Civ. App. 2024).

## Conclusion

For the foregoing reasons, we conclude that the custodians failed to prove by clear and convincing evidence that there existed grounds for terminating the father's parental rights to child and that there were no viable alternatives to terminating his parental rights. We also conclude

that the juvenile court committed reversable error in failing to hold a hearing on the mother's postjudgment motion. As a result, we reverse the juvenile court's judgment, and we remand the cause to the juvenile court with instructions to hold a hearing to consider the arguments that the mother raised in her postjudgment motion.

CL-2023-0828 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

CL-2023-0832 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Edwards, Hanson, and Lewis, JJ., concur.