THOMPSON, Judge.
On August 17, 2000, D.D.F. (“the mother”) filed a petition in the Walker Circuit Court for an ex parte temporary restraining order against L.M. (“the father”), a petition seeking to terminate the father’s parental rights to B.N.M. and A.M.M. (hereinafter “the children”), asserting that the father had abandoned the children, and a petition for a rule nisi. On August 17, 2000, the circuit court granted the mother’s petition for a temporary restraining order.
On December 6, 2000, the mother filed a motion seeking to sever her petition to terminate the father’s parental rights and seeking permission to refile that petition in the Walker County Juvenile Court. The circuit court granted that motion, and on December 7, 2000, the mother filed her motion seeking to terminate the father’s parental rights in the Walker County Juvenile Court (hereinafter “the trial court”). On March 16, 2001, the father filed a motion to dismiss; the trial court denied that motion. The father filed an answer, a petition seeking to have the court hold the mother in contempt, a motion to dissolve the circuit court’s August 17, 2000, temporary restraining order, and a counterpetition seeking to modify custody. On February 8, 2002, the trial court entered an order in which it terminated the father’s parental rights to the children. The father filed a postjudgment motion; the trial court denied that motion. The father appealed.
A trial court’s judgment entered following an ore tenus proceeding is presumed correct, and its decision will not be disturbed on appeal absent a showing of plain or palpable error. S.B. v. State Dep’t of Human Res., 743 So.2d 470 (Ala.Civ.App.1999). In reviewing a case that involves the termination of a parent’s parental rights, we note that
“the primary focus of a court ... is to protect the welfare of children and at the same time to protect the rights of their parents. Inasmuch as the termination of parental rights strikes at the very heart of the family unit, a court should terminate parental rights only in the most egregious of circumstances.”
Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). Therefore, this court has consis *173 tently held that “[e]very parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent’s custody would be in the best interests of the child.” A.R.E. v. E.S.W., 702 So.2d 138, 139 (Ala.Civ.App.1997).
When a custodial parent brings an action to terminate the other parent’s parental rights, the court must apply a two-prong test in determining whether to terminate those rights.
“First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered.”
Ex parte Beasley, 564 So.2d at 954. A finding of dependency is not required when one parent seeks to terminate the other parent’s parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).
Section 26-18-7, Ala.Code 1975, which sets forth the statutory authority for terminating parental rights, provides, in part:
“(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
“(4) Conviction of and imprisonment for a felony.
“(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
[[Image here]]
“(8) That parental rights to a sibling of the child have been involuntarily terminated.
*174 “(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
The mother and father separated in September 1992; at that time, the parties were living in Coconut Creek, Florida. The parties were never married. After the parties’ 1992 separation, the father moved to Hot Springs, Arkansas. Three weeks after the parties separated, the mother relocated to Ozona, Florida. The father testified that the mother did not notify him of her move or provide him with her new address and telephone number. According to the father, he located the mother by calling directory assistance “all over the state of Florida” and asking for the mother’s telephone number. The mother admitted that she did not give the father her address and phone number in Ozona. The father testified that in February 1993, after he located the mother and the children in Ozona, he drove to Ozona and visited with the children for five days. The father stated that during that period, he stayed in the mother’s house with the mother and the children.
The mother testified that after living in Ozona for one year, she and the children moved to Jasper, Alabama[1] and that she again did not notify the father of her move, her new address, or her new telephone number. The mother married J.F. (hereinafter “the stepfather”) in July 1994. The mother testified that after she and the stepfather married, the parties moved to Florida while the stepfather sought a construction job. According to the mother the stepfather was unable to find a job, and after six months the mother, the stepfather, and the children returned to Jasper. The mother testified that she did not give the father her address or telephone number during the six months the parties lived in Florida. The father testified that he was unable to locate the children during that time. At the time of the hearing in this matter, the mother, the stepfather, and the children lived in Jasper, and the father lived in Hot Springs, Arkansas.
The father filed a petition in 1994 seeking visitation with the children; the record does not indicate the date on which the father filed that petition. The mother testified that neither she nor the children had had any contact with the father from the time she and the children initially moved to Jasper in late 1993 until the father filed his 1994 petition seeking visitation with the children. In October 1996, the trial court entered an order awarding the father one day of visitation with the children per *175 month and four days of visitation during the Christmas holiday and ordering the father to pay child support of $248 per month. The mother testified that the father exercised his visitation rights during 1995 and 1996; that the father occasionally sent the children birthday gifts; and that the father had made some of the court-ordered child-support payments. The stepfather testified that the father “very rarely” telephoned the children between 1994 and the hearing in this matter.
The mother testified that the father exercised only the Christmas visitation with the children in 1996. According to the mother, when the father picked up the children for that visitation, the father told her that he was taking the children to Anniston to see his family. The mother testified that the father did not take the children to Anniston, but that the father took the children to Arkansas. The father admitted that he took the children to Arkansas during his 1996 Christmas visitation, but the father denied that he told the mother he was taking the children to Anni-ston. The father testified that he returned the children to the mother in Jasper within the time period proscribed for his Christmas visitation in the October 1996 order.
The mother testified that she and the father met at a mall in Jasper in 1999 to allow the father to visit with the children, but that the children “refused” to go with the father and that she would not force them to go with him. The mother testified that the father brought the children presents during that meeting.
The mother testified that she was opposed to the father’s receiving any visitation with the children, and that she felt that the children were in danger when they were with the father. The mother testified that she did not trust the father. The mother stated that the paternal grandmother accompanied the father during most of the times that he exercised visitation with the children. The mother also stated that, at the time of the hearing, she felt more comfortable about allowing the father visitation because the children were older and more mature. However, the mother testified that the children no longer wanted to visit with their father.
The mother testified that in 1991, when she was pregnant with B.M., the father physically assaulted her, and that the father spent time in jail as a result of that altercation. The father admitted that he “slapped” the mother on that occasion, and the father asserts that he was so upset by his behavior that he telephoned the police and informed them of his actions. The mother stated that the father physically assaulted her “numerous times” after the parties separated in 1992.
The father is currently employed at a grocery store/delicatessen in Hot Springs, Arkansas. The father testified that he currently fives with L.H., his fiancée, and that he and L.H. have a child together. The father testified that prior to working at the grocery store/deli, he was unemployed for several months. The father testified that during that time he cared for his and L.H.’s child. The father testified that he worked at a Pizza Hut restaurant before his several months of unemployment. The father admitted that he had not made all of the required child-support payments pursuant to the trial court’s October 1996 order. The father testified that he withheld those payments in response to the mother’s failure to comply with court’s October 1996 visitation schedule.
The father testified that his visitation with the children went well during the first year following the entry of the trial court’s October 1996 order. The father testified that one year after the trial court’s order, the mother stopped complying with the trial court’s visitation schedule. The fa *176 ther testified that the parties agreed that he would telephone the mother on the Thursday night before the weekend he was to exercise his visitation to confirm. According to the father, one year after the October 1996 order was entered, he began having difficulty reaching the mother by telephone to confirm his visitation. The father stated that he would leave messages on her answering machine, but that the mother never returned his telephone calls. The father testified that the parties agreed to meet at a mall in Jasper when the father picked up the children for his scheduled visitation. The father asserts that on two or three occasions the he was unable to exercise his visitation because the mother did not show up at the mall and did not call to notify him that she would not be there. The father testified that he sent gifts to the children’s school and enclosed cards with his telephone number, but that he never received a response. The father testified that on a few occasions he drove to Jasper on a date that was not his scheduled visitation date hoping to be able to see the children.
The father testified on one occasion when he drove to Jasper during a time that was not scheduled for his visitation, he located the mother and the children at a baseball field during the children’s baseball practices. According to the father, the mother allowed him to exercise visitation with the children on that occasion. The mother testified that she offered to allow the father only to take the children to lunch on that occasion, but that the father did not return the children until the next day. The father testified that he thought the mother was allowing him to exercise his normal hours of visitation with the children, which would allow him to keep the children overnight. The father testified that he, the children, and J.C., a male friend of the father’s, stayed in a hotel in Jasper during that overnight visit. According to the father, he rented the children a movie, a video-game machine, and some video games to play during their stay. The mother testified that within a few weeks of that visitation, the mother took the children to counseling. The mother stated that the children were not sleeping, that they were exhibiting aggressive behavior, and that their grades in school had dropped.
The father testified that on another occasion he located the mother and the children at the football field during B.N.M.’s football practice. The father stated that on that occasion the mother did not allow him to visit with the children, but that he stayed and watched B.N.M. practice. The mother testified that on that occasion the father was accompanied by the paternal grandmother and the father’s girlfriend. The mother testified that the girlfriend sat below the father on the bleachers and leaned back against the father’s legs, and that the father kissed the girlfriend. The mother stated that the father’s behavior was inappropriate. Audrey Taylor, a friend of the mother and the stepfather, testified that she observed the father on the occasion that he attended B.N.M.’s football practice. Taylor testified that the girlfriend sat in the father’s lap; that the father kissed the girlfriend; and that the father’s behavior was inappropriate. The father admitted kissing the girlfriend, but he denied that he and the girlfriend acted in an inappropriate manner.
The August 17, 2000, a temporary restraining order prohibited the father from exercising visitation with the children pending the outcome of the hearing. The father testified that prior to the trial court’s August 17, 2000, order suspending his visitation, his visitation with the children was sporadic. The father admitted that there were occasions that he was un *177 able to, was late to, or did not, pick the children up for his visitation.
S.M., the paternal grandmother, testified that the father had difficulty exercising visitation on some occasions because the children had activities scheduled during the father’s visitation period. The paternal grandmother testified that the mother relocated to a different residence in Jasper and did not notify the father or her of the new address; the record on appeal does not indicate and the paternal grandmother did not testify as to the time frame of that relocation. The paternal grandmother stated that the mother’s telephone number did not change, that she telephoned the mother, and that she left several messages on the mother’s answering machine. According to the paternal grandmother, the mother did not return her telephone calls. The paternal grandmother testified that she was able to determine the name of the street where the mother’s new house was located by contacting the electric company. The paternal grandmother stated that she telephoned a florist in Jasper and asked if they could deliver flowers and candy to the children if she knew only the name of the street on which they lived. According to the paternal grandmother, an employee of the florist informed her that the street was small and that they would be able to locate the mother’s house. The paternal grandmother testified that the father has been unemployed on several occasions.
The two children born of the parties’ relationship were 10 years old and 12 years old at the time of the hearing in this matter. The court took the children’s testimony in chambers. A.M.M. testified that she was nine years old when the father took them for the unscheduled overnight visit after the baseball practice. According to A.M.M., when they arrived at the hotel, she asked J.C., the father’s friend if she could telephone her mother. A.M.M. testified that the father’s friend told her that he did not know how to make a local telephone call from the room. A.M.M. testified that she pushed him out of the way and told him she was going to the front desk to ask how to make the telephone call. According to A.M.M., the father’s friend told her that he would figure out how to make the call and that she could not go to the front desk. A.M.M. testified that the father’s friend did not allow her to telephone her mother and that he spanked her.
A.M.M. testified that on the occasion that the father came to B.N.M.’s football practice, she was sitting in the stands and was playing with a small blackboard. According to A.M.M., she wrote the words “freak, I hate you” on the blackboard and held it up to show the father.
When asked whether the children would like the court to end their visitation with the father, the children stated that they would. When the court inquired as to the children’s reasons, A.M.M. stated “we don’t even get to see him anyway, we haven’t seen him in two years.”
The record indicates that the stepfather filed a petition seeking to adopt the children, and that that petition was pending in the probate court awaiting the outcome of this hearing. The mother testified that the father informed her that he had signed the paperwork necessary to permit the stepfather to adopt the children and that he had mailed it to her a few days before the hearing. The father testified that he asked the mother to send him the paperwork so he could look at it; that he did not tell the mother that he had signed the paperwork; and that he had not signed the paperwork. The father stated that he did not feel it was in his children’s best interest to terminate his parental rights.
*178 The record contains a printout of the court’s record of the father’s child-support payments. That printout is dated October 10, 2001, and indicates that the father made child-support payments during six months of 1996, two months of 1997, and one month of 1999. The printout indicates that the father began making regular monthly payments in November 2000, and that he consistently paid monthly child support from that month until April 2001. According to the printout, the father did not pay child support form May 2001 through October 2001, just before the hearing in this matter.
The trial court’s order states, in pertinent part,
“[t]hat, although he is an able-bodied man capable of working and earning income, [the father] has failed to provide financial support for [the children]. That [the father] is unable or unwilling to discharge his parental responsibilities. That [the father] has withheld from [the children], without good cause or excuse, his presence, care, love, protection, maintenance, or the opportunity for the display of filial affection. That [the father] has failed to claim the rights of a parent and has failed to perform the duties of a parent. That [the father] has been unavailable or unwilling to discharge his responsibilities to and for said children. That the present situation or conduct is such as to render him unable to properly care for his children and that such situation or conduct is unlikely to change in the foreseeable future.
“That [the father’s] contacts, by letter, telephone, or in person with the children ... has been sporadic since the entry of the [October 1996] order. That [the father] habitually allows more than six (6) months to elapse between his contact with the children. That, on at least one occasion, [the father] removed the children from the state of Alabama during a visitation and did not advise [the mother] of his intentions to do so. That on a later occasion [the father] took the children for an unauthorized overnight visitation after telling [the mother] that he was taking them to eat and then he did not allow the children to call and tell their mother where they were spending the night. [The mother] testified that, subsequent to this occasion, she had to seek mental health counseling for the children.
“The Court finds that after hearing the testimony of the various witnesses on behalf of [the mother] and [the father], that it is in the best interest of [the children] to terminate the parental rights of [the father]. The court further finds that [the father] has not maintained steady employment over the past several years and has not provided financial support for his children. That [the father] has not maintained consistent physical contact with the children and that on some occasions of visitation did place the children at risk or engaged in behavior which caused the children mental anguish, such that their mother was compelled to seek mental health counseling for them.”
On appeal, the father asserts that the trial court erred in terminating his parental rights because its decision was not supported by clear and convincing evidence. Although § 26-18-7, Ala.Code 1975, provides several factors a court may consider in determining whether to terminate a parent’s parental rights, it appears that “abandonment” is the only factor from the list that the trial court indirectly noted as the basis for its decision to terminate the father’s parental rights to the children. Section 26-18-3(1), Ala.Code 1975, defines “abandonment” as “[a] voluntary and in *179 tentional relinquishment of the custody of a child by a parent, or a -withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.” “Clear and convincing evidence” is
“[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.”
§ 6-11-20(4), Ala.Code 1975.
The record indicates that the father sought and received visitation rights with the children; that the father exercised visitation with the children consistently for the first year after he was granted visitation; and that the father’s visitation with the children grew infrequent. However, the father testified that his infrequent visitation with the children was a result of many factors, including the fact that the mother failed to return his telephone calls when he called to confirm his visitation and that, on two or three occasions, he drove from Arkansas to Alabama and the mother did not show up to exchange the children for visitation. Further, the record reveals that the mother relocated several times without notifying the father of her new address and telephone number and that the father made efforts to locate the children following the mother’s reloca-tions. According to the record, the father sent the children birthday gifts and cards, and the father made child-support payments, although infrequently.
Abandonment implies an intentional act on the part of the parent. § 26-18-3(1), Ala.Code 1975. Due to the serious nature of the action of terminating a parent’s parental rights, this court must carefully review the unique set of facts established in each ease in determining whether clear and convincing evidence was presented to support the termination of those rights. This court does not condone either parent’s behavior; however, a father’s right to be a parent to his children is fundamental and a court should terminate those rights “only in the most egregious of circumstances.” See Ex parte Beasley, 564 So.2d at 952. This court recognizes the legal principles that govern a parental rights termination case and the presumption of correctness attached to the trial court’s judgment when that judgment is based on ore tenus evidence. However, after reviewing the record, this court must conclude that the trial court’s judgment terminating the father’s parental rights is not supported by clear and convincing evidence. See § 26-18-3(1), Ala.Code 1975; § 6-11-20(4), Ala.Code 1975.
The father asserts that the trial court erred in terminating his parental rights because the trial court failed to consider other viable alternatives to the termination of his parental rights. Because we conclude that the record did not contain clear and convincing evidence to support the termination of the father’s parental rights, we pretermit the discussion of this issue on appeal. However, this court does note that the problem with the visitation in this case might be addressed by the trial court’s imposing a more restrictive visitation schedule.
The trial court’s order terminating the father’s parental rights is reversed and the case is remanded for the entry of an order consistent with this opinion.
REVERSED AND REMANDED.
*180 YATES, P.J., and PITTMAN, J., concur.
CRAWLEY, J., concurs specially.

. The record does not specify the exact date that the mother and the children moved to Jasper; however, the record indicates that they moved to Jasper sometime in late 1993.