PITTMAN, Judge.
J.H. ("the father") appeals from a judgment of the Bibb Juvenile Court ("the juvenile court") terminating his parental rights to R.H. ("the child"), his daughter. We reverse the juvenile court's judgment.
Facts and Procedural History
In September 2011, H.W. ("the mother") gave birth to the child. Although the mother was married to D.W. when the child was conceived and had two daughters ("the half sisters") by him before the child was conceived, the father testified that he and the mother had been living together when the child was conceived and that he had known that the child was his as soon as he learned that the mother was pregnant with the child.[1]
When the child was born, the father was in prison, serving a sentence imposed as a result of his second conviction for possession of chemicals used to manufacture crystal methamphetamine, which is a Class B felony. Tests performed when the child was born indicated that the mother had opiates in her system. The Bibb County Department of Human Resources ("DHR") investigated whether the mother had prescriptions for the opiates in her system and determined that she did not. However, DHR did not remove the child from the mother's custody at that time.
The record indicates that, in January 2015, J.G. and Sa.G ("the maternal grandparents") had custody of the half sisters, although the record does not indicate the circumstances that had prompted the maternal grandparents' being awarded custody or the process by which that award of custody was accomplished. The mother testified that she had custody of the child in January 2015 and that she and the child were living with the maternal grandparents and the half sisters in January 2015 when DHR received a report that illegal drugs were being used at the maternal grandparents' house. DHR investigated that report, determined that the report was accurate, removed the half sisters from the custody of the maternal grandparents, and removed the child from the custody of the mother. The father testified *1231 that he had been released from prison before January 2015 but was back in prison when DHR became involved with the child and her family in January 2015.
After removing the child from the mother's custody in January 2015, DHR temporarily placed the child in the care of J.M. ("the paternal grandmother") but removed the child from her care in April 2015 after receiving information indicating that the paternal grandmother had allowed the child to have contact with Sa.G., the maternal grandmother. In October 2015, DHR placed the child and the half sisters with the maternal grandparents.[2] However, in February 2016, DHR received a report that J.G., the maternal grandfather, was using illegal drugs, investigated the report, determined that the report was accurate, and removed the child and the half sisters from the maternal grandparents' care.
Sometime between January 2015 and October 2016, the father was again released from prison. The record does not indicate when he was released or whether he had any contact with DHR before October 2016, although it implies that, before October 2016, DHR had asked the father to undergo a DNA test to determine if he was the child's biological father and that the father had refused. John Richards, the DHR caseworker assigned to the child's case, testified that, in October or November 2016, DHR had obtained a court order compelling the father to undergo a DNA test, that the father had undergone the test, that the results of the test had confirmed that the father was indeed the biological father of the child, and that the juvenile court had adjudicated him the father of the child in late October or early November 2016.[3] The father testified that, sometime after he had been released from prison the first time and before January 2015, when he was in prison the second time, he had begun living with the mother and the child; however, the record does not indicate how long that living arrangement had lasted before he returned to prison.
In October 2016, the father underwent a drug test that indicated the presence of marijuana, morphine, and methadone in his system. Richards testified that, after he received the results of the father's drug test, he had asked the father to provide proof that he had prescriptions for the morphine and methadone within a week so that DHR could determine what services should be provided the father to assist him in reuniting him with the child. Richards further testified that the father did not provide that proof until several months had elapsed. The father testified that he had brought the requested proof of his prescriptions during the week following DHR's request. The father further testified that DHR had first told him that he could visit the child in January 2017 and that, between January 2017 and April 19, 2017, the date of the trial of this action, he had visited with the child face-to-face on three occasions and had talked to the child on the telephone on a regular basis.
*1232 The father testified that he had back surgery while he was in prison and that the morphine had been prescribed to treat his back pain. He further testified that he had tried to work since his release from prison but that the condition of his back had prevented him from maintaining employment. He admitted that, when this action was tried on April 19, 2017, he had no income and that, therefore, he could not care for the child at that time. He testified that he had applied for disability benefits but had not received a response to his application. The father admitted that, when this action was tried, he had two felony criminal charges pending against him.
In December 2016, DHR filed a petition asking the juvenile court to terminate the mother's and the father's parental rights to the child. Following a bench trial at which it received evidence ore tenus, the juvenile court entered a judgment terminating the mother's and the father's parental rights to the child. The father timely filed a postjudgment motion in which he asserted, among other things, that the juvenile court had erred in terminating his parental rights because, he said, DHR had failed to show that it had made reasonable efforts to reunite him with the child. The father's postjudgment motion was denied by operation of law; thereafter, he timely appealed to this court. We have jurisdiction over his appeal by virtue of the fact that the record on appeal satisfies the requirements of Rule 28(A)(1)(c)(ii), Ala. R. Juv. P. The mother did not appeal from the juvenile court's judgment.
Standard of Review
"[W]e will reverse a juvenile court's judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I.[ v. State Dep't of Human Res.], 975 So.2d [969] at 972 [ (Ala. Civ. App. 2007) ]." J.C. v. State Dep't of Human Res., 986 So.2d 1172, 1183 (Ala. Civ. App. 2007). Clear and convincing evidence is
" ' "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
" '§ 6-11-20[ (b) ](4), Ala. Code 1975.'
" L.M. v. D.D.F., 840 So.2d 171, 179 (Ala. Civ. App. 2002)."
J.C., 986 So.2d at 1184 (emphasis omitted).
Analysis
We will consider the father's arguments in their logical order rather than in the order he presents them in his brief. Logically, the father's first argument is that DHR failed to prove that it had made reasonable efforts to reunite him and the child. Subject to exceptions not here applicable, county departments of human resources have a duty to make reasonable efforts to rehabilitate the parents of dependent children before seeking the termination of those parents' parental rights. See W.A. v. Calhoun Cty. Dep't of Human Res., 211 So.3d 849, 852 (Ala. Civ. App. 2016). Whether a county department's efforts have been reasonable and whether those efforts have succeeded are questions of fact to be determined by the juvenile court. See W.A., 211 So.3d at 852-53. In this case, the juvenile court found: "The Bibb County Department of Human Resources has made reasonable efforts toward rehabilitation and reunification and *1233 such efforts have failed because of the parents' refusal to change their circumstances to meet the needs of the child." "In reviewing that factual determination, 'this court has a narrow standard of review that allows us to disturb those findings only when they are so unsupported by the evidence as to be plainly and palpably wrong.' " W.A., 211 So.3d at 853 (quoting M.H. v. Jefferson Cty. Dep't of Human Res., 42 So.3d 1291, 1294 (Ala. Civ. App. 2010) ).
The record indicates that DHR obtained a court order compelling the father to undergo a DNA test in order to determine his paternity of the child, that it administered or arranged for a drug test of the father in October 2016, and that it arranged visitation for him beginning in January 2017 after it had already filed the petition to terminate his parental rights in December 2016. The record contains no evidence indicating that DHR ever offered the father any services to assist him in rehabilitating himself such as assistance in finding a job that his back condition would not preclude him from performing, assistance with his application for disability benefits, assistance in locating stable housing, or parenting classes. The evidence established that the child was dependent when this action was tried and that some of the factors upon which a termination of parental rights could be based existed in this case; however, we conclude that the juvenile court's finding that DHR had made reasonable efforts to reunite the father and the child is so unsupported by the record as to be plainly and palpably wrong. Therefore, we reverse the judgment of the juvenile court insofar as it terminated the father's parental rights to the child, and we remand the cause to the juvenile court for further proceedings consistent with this opinion. Based on our disposition of this issue, we do not reach the father's other arguments.
REVERSED AND REMANDED.
Thompson, P.J., and Moore and Donaldson, JJ., concur.
Thomas, J., concurs in the result, with writing.
THOMAS, Judge, concurring in the result.
J.H. ("the father") has appealed a judgment of the Bibb Juvenile Court ("the juvenile court") terminating his parental rights to his daughter, R.H. ("the child"). The main opinion reverses the juvenile court's judgment and remands the cause for further proceedings. Because the record indicates that the Bibb County Department of Human Resources ("DHR") has not asserted, at any stage in the underlying proceedings, the applicability of § 12-15-32(c)(1)f., Ala. Code 1975, to the circumstances presented by this case, I concur in the result reached by the main opinion.
Section 12-15-312, Ala. Code 1975, provides, in relevant part:
"(c) Reasonable efforts shall not be required to be made with respect to a parent of the child if the juvenile court has determined that the parental rights of the parent to a sibling of the child have been involuntarily terminated or that a parent has done any of the following:
"(1) Subjected a child to an aggravated circumstance against the child or a sibling of the child and the risk of child abuse or neglect is too high for the child to remain at home safely or to be returned home. An aggravated circumstance includes, but is not limited to, rape, sodomy, incest, aggravated stalking, abandonment, torture, chronic abuse, or sexual abuse. An *1234 aggravated circumstance may also include any of the following:
"....
"f. When a parent is incarcerated and the child is deprived of a safe, stable, and permanent parent-child relationship."
The child was five years old at the time of the April 2017 trial. H.W. ("the mother") and the father were living together prior to the child's birth. When the child was born, however, the father was incarcerated. After his term of incarceration ended, the father began living with the mother and the child but, it appears, was later convicted of another offense and sentenced to another term of incarceration. "When I got out," the father testified, "the kids were gone." Although the record is unclear regarding the exact nature of each offense resulting in the father's apparently separate terms of incarceration, he testified that he had been convicted of possessing chemicals used to manufacture methamphetamine and that he had been convicted of "an escape charge too." At the time of the trial, the father had been charged with committing two additional felonies.
While the father was incarcerated, the mother and the child began living with the mother's parents, J.G. and Sa.G., who, DHR discovered, were using illegal drugs. At that time, DHR became involved with the child, and the child was subsequently placed with multiple relatives before eventually being placed with the mother's cousins, St.G. and B.G., with whom she was living at the time of the trial. As noted above, each of the foregoing events transpired during the first five years of the child's life.
When a parent is incarcerated and, during the parent's incarceration, the circumstances of his or her child's life deteriorate to such an extent that the state must intervene to protect the child's welfare, the burden placed upon the state to reunite the parent with the child upon his or her release from incarceration must be measured against the harm caused to the child by the parent's incarceration. The legislature's decision to include § 12-15-312(c)(1) f. on the list of "aggravated circumstance[s]" described in § 12-15-312(c)(1) reflects that reality. Under the facts of this case, the juvenile court may well have concluded that the events occurring during the father's incarceration had resulted in the child's being deprived of a "safe, stable, and permanent" relationship with both the father and the mother and that DHR should be relieved of making efforts toward reuniting the father with the child. See § 12-15-312(c)(1) f.
The record indicates, however, that DHR did not ask the juvenile court to make that determination. See § 12-15-312(a)(2), Ala. Code 1975 (providing that, when a child is placed in DHR's custody or foster care, the juvenile court should enter an order "[w]ithin 60 days after the child is removed from the home of the child, [determining] whether reasonable efforts have been made to prevent removal of the child or whether reasonable efforts were not required to be made" (emphasis added) ). In my opinion, DHR should have presented evidence to the juvenile court for a timely determination regarding whether, in light of the father's incarceration, it was required to make reasonable efforts to reunite the father with the child upon the father's release from incarceration. At a hearing on the issue, the juvenile court would be afforded an opportunity to consider evidence regarding the nature of the conviction or convictions resulting in the parent's incarceration, the anticipated duration of the parent's incarceration, and how that evidence relates to the circumstances that caused the child to become dependent upon the state for protection.
*1235 This record contains no such determination from the juvenile court.
I recognize that the father's paternity of the child was not adjudicated until October or November 2016. In my view, however, the question of the father's paternity should have been brought to the juvenile court's attention much sooner than it appears to have been, so that, to the extent possible, foreseeable issues related to that question could be incorporated into or addressed by the permanency plan for the child. The consequences of failing to do so are made clear by the analysis set out in the main opinion. In other words, the record in this appeal indicates that DHR sought to terminate the father's parental rights weeks after he acquired them. Considering those facts alone, it does not appear that DHR could have made reasonable efforts toward reuniting the father with the child, and, therefore, I agree that we are compelled to reverse the juvenile court's judgment. Had DHR sought such a determination from the juvenile court, however, it may well have been relieved from making such efforts in the first place.
It is the child who will suffer the consequences of our reversing the juvenile court's judgment. In addition to the tumult she has experienced in the first five years of her life, she must now also endure DHR's efforts to reunite her with the father, who, the record indicates, has spent a substantial portion of her life incarcerated but has also received practically no services from DHR. In effect, the process must "start over." If the record on appeal contained a timely determination from the juvenile court that DHR had not been required to make reasonable efforts toward reuniting the father with the child based on the father's incarceration, I would likely affirm the juvenile court's judgment. Because it does not, I concur in the result reached by the main opinion.

The record does not indicate D.W.'s whereabouts when the child was conceived; however, it implies that he was not living with the mother.

Presumably, DHR was satisfied that the maternal grandparents had rehabilitated themselves between January 2015 and October 2015; however, the record is silent on that point.

The record does not contain any pleadings or orders related to the adjudication of the father's paternity. Because the child was born during the mother's marriage to D.W., D.W. was the presumed father of the child under § 26-17-204(a)(1), Ala. Code 1975. Therefore, we presume that, before the father's paternity was adjudicated, D.W. had provided proof that he did not wish to persist in his status as the presumed father of the child. See § 26-17-607(a), Ala. Code 1975 ("If the presumed father persists in his status as the legal father of a child, neither the mother nor any other individual may maintain an action to disprove paternity.").