Rel: May 23, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2023-0615

_____

## W.C.M.

## v.

## M.P.

### Appeal from Baldwin Juvenile Court
### (JU-19-510.02)

After Remand from the Alabama Supreme Court

PER CURIAM.

This court's reversal of the judgment of the Baldwin Juvenile Court ("the juvenile court") terminating the parental rights of W.C.M. ("the father"), see W.C.M. v. M.P., [Ms. CL-2023-0615, July 19, 2024] ___ So. 3d ___ (Ala. Civ. App. 2024), has been reversed by our supreme court and

the case has been remanded to this court for further consideration of the arguments raised by the father relating to the juvenile court's finding of abandonment and its determination that no viable alternatives to the termination of his parental rights existed. Ex parte M.P., [Ms. SC-2024-0684, Mar. 7, 2025] ___ So. 3d ___ (Ala. 2025).

We set out the procedural history and most of the facts relevant to the issues on appeal in W.C.M.:

> "In July 2021, M.P. ('the mother') filed in the … the juvenile court … a petition seeking to terminate the parental rights of … the father … to E.H.P. ('the child'), who had been conceived outside of wedlock. After a trial held over four sessions in August 2021, September 2021, and July 2023, the juvenile court entered a judgment terminating the father's parental rights. The father filed a postjudgment motion directed to that judgment that the juvenile court denied. The father then filed a timely notice of appeal to this court.
>
> "….
>
> "The record reflects that the mother filed a paternity and child-support action in 2015, shortly after the child was born. During that action, which was still pending at the time of the entry of the termination-of-parental-rights judgment,[1] the parties had twice operated under different temporary agreements setting out the father's right to visit with the child, one of which required the father to pay certain sums to the mother for child support. During the pendency of the paternity and child-support action, the father filed motions seeking to compel the mother to allow him the visitation that was set out in the temporary agreements, and, in two separate orders in 2017, the juvenile court required the mother to take

appropriate actions to permit the father to exercise his visitation. The record indicates that the father exercised the visitation that he was provided in the temporary agreements. However, as of the time of the filing of the termination-of-parental rights action, no agreement or order of the juvenile court provided visitation rights to the father or governed child support. The mother had filed a previous termination-of-parental-rights action in 2019 but the juvenile court declined to terminate the father's parental rights at that time.

"The mother testified that, after the 2019 termination-of-parental-rights action was concluded in November 2019, she had made efforts to provide opportunities for the father to visit with the child. She explained that she had arranged for the father to see the child each Thursday by picking up the father so that she, he, and the child could have dinner at a restaurant together.[2] Although the mother said that the father had initially participated in the mother's attempts to provide opportunities for him to visit the child, she said that later he began requesting that some of the visits be rescheduled. She testified that she had attempted to accommodate the father's requests. According to the mother, in January 2020, the father informed her that he was unable to visit because he had begun working in Florida. The mother said that she had offered to take the child to visit the father in Florida in January 2020 but that he had declined her offer because he had the flu. The mother testified that, at some point in or after January 2020, she would drop the child off at the home of the father's parents ('the paternal grandparents') on Thursday evenings so that the father could visit and have dinner with the child.

"According to the mother, after the father began working in Florida, he had informed her that she could come and pick the child up an hour early from some of the Thursday visits at the paternal grandparents' house because, she said, he had told her that he had to return to Florida. She testified that the father had declined a visit on March 19, 2020,

3

because, she said, he had told her that he feared that he had been exposed to the virus that causes 'COVID-19.' She said that he had not visited the child in April 2020 or May 2020; however, she indicated that the father had spoken to the child via FaceTime, a videoconferencing application, on April 1, 2020, and April 4, 2020. She testified that the father had texted her on May 8, 2020, but, she said, he had not asked about the child or requested a visit at that time. The mother further testified that the father had contacted her about the child's dance recital in late June 2020, but, she said, he had ultimately decided that he could not attend. She said that he had telephoned her to arrange to FaceTime with the child on July 1, 2020, the date of the child's birthday, but, the mother explained, he had not completed the FaceTime call at the arranged time because he had instead texted her about some information relating to a recent filing in the pending paternity and child-support action. The mother testified that the father had not made any further attempt to contact the child until she filed the termination-of-parental-rights action in 2021.

"The mother testified that she had also begun allowing the child to visit regularly with the paternal grandparents on Sundays. The mother further testified that the child had seen the father during a visit with the paternal grandparents in August 2020 and that the father had engaged in a FaceTime call with the child during a visit with the paternal grandparents in January 2021. The mother described the child as having been 'upset' after both contacts with the father. Regarding the August 2020 visit, the mother stated that she herself had been upset because she had not been able to 'prepare [the child] for that' and described the child as having been 'confused' and 'upset' because, the mother testified, '[the child] wanted to just go over and play with [the paternal grandmother].' The mother stated that '[the child] was upset [in January 2021] because you can't just dip out on somebody for months and then just FaceTime them, you know.' As a result of the father's attempt to contact the child when she was visiting with the paternal grandparents in

January 2021, the mother testified that she had ended the child's Sunday visits with them because of what she described as her 'mistrust.'

"The mother also testified that the father had not been paying child support. She said that he had paid $600 per month over four months in 2020. She also complained that he had neither paid for any portion of the child's noncovered medical expenses nor funded the child's extracurricular-activity expenses, which, she said, included expenses for dance classes, cheer camp, and art camp.

"The father testified that he had willingly paid some unspecified amount of child support in both 2020 and 2021 but admitted that he had not paid any money to the mother in 2022 or 2023. He said that he had paid the child support specified in the 2017 temporary agreement entered in the paternity and child-support action. He further testified that the mother had never sent him any medical bills or other bills for him to pay.

"On the last day of the trial, the father testified that he was not employed full time and was seeking disability. He said that he does odd jobs for friends to make ends meet and that he lives in a room in a house owned by a friend in Gulf Breeze, Florida, and does not pay rent. He also testified that he regularly travels back and forth between Florida and [the paternal grandparents'] house in Alabama.

"The father explained that the mother had not followed the parties' earlier agreements relating to visitation made in the paternity and child-support action. He described the mother as being amenable to visitation but only on her own terms. He said that the mother 'got nasty' after certain filings were made in the paternity and child-support action in July 2020 and that he 'just walked away and said I'll wait for court.' He also commented that he had decided not to pay any

amount for the support of the child because the mother had not allowed him to visit."

"_____

"[1]The paternity and child-support action was continued multiple times for various reasons and was apparently stayed because the father had filed for bankruptcy protection and again when the father's bankruptcy action was reportedly 'reopened.' However, the automatic stay that becomes effective upon the filing of a petition for bankruptcy does not operate as a stay

"'(A) of the commencement or continuation of a civil action or proceeding --

"'(i) for the establishment of paternity;

"'(ii) for the establishment or modification of an order for domestic support obligations; [or]

"'(iii) concerning child custody or visitation ....'

"11 USCA § 362(b)(2)(A).

"[2]The father does not drive because of problems with his vision."

___ So. 3d at ___.

The father argues that the mother failed to establish that he had abandoned the child or that all viable alternatives to the termination of his parental rights were exhausted. Generally, the appellate courts of

6

this state have, in the past, been reluctant to affirm the termination of a noncustodial parent's parental rights when the child was residing safely in the home of the custodial parent. See, e.g., Ex parte Brooks, 513 So. 2d 614 (Ala. 1987); S.M.M. v. R.S.M., 83 So. 3d 572 (Ala. Civ. App. 2011). Both this court and our supreme court have often repeated that the termination of parental rights should not be accomplished to satisfy the desires of one or both of the child's parents. See Ex parte Brooks, 513 So. 2d at 617; S.D.P. v. U.R.S., 18 So. 3d 936, 939 (Ala. Civ. App. 2009). Our supreme court has explained that, "[w]hen a child's welfare is threatened by continuation of parental rights, the law provides a means for terminating those rights." Ex parte Brooks, 513 So. 2d at 617. Thus, termination of parental rights should be confined to those cases in which "the most egregious of circumstances" warrants such action. Ex parte Beasley, 564 So. 2d 950, 952 (Ala. 1990).

The record reflects that, at the time the mother filed her second termination-of-parental-rights petition, the mother and the father had been involved in the contentious paternity and child-support action before the juvenile court for over five years, without having achieved a final resolution of the father's rights to visitation or his obligation to pay

child support.[1]  The record contains numerous pleadings from the paternity and child-support action, including requests from the father that the juvenile court enter pendente lite orders establishing his rights to visitation and requesting that the mother be held in contempt for failing to comply with temporary agreements that the parties had reached relating to visitation.  Those pleadings demonstrate that the mother had frustrated the father's ability to visit with and develop a relationship with the child throughout the litigation of the extended paternity and child-support action.

On November 21, 2016, the parties entered into a "Mediated Temporary Agreement," which provided that "the [f]ather's parenting time shall be for one hour per week at the Daphne Family Center."  That agreement, which the juvenile court incorporated into a pendente lite order entered in the paternity and child-support action on November 22, 2016, required the mother and the father to take the necessary steps to set up such visitation with the Daphne Family Center.  In a December 2016 motion in the paternity and child-support action seeking to enforce

---

[1]The juvenile court adjudicated the father's paternity in an interlocutory order entered in January 2017.

the mediated temporary agreement, the father alleged that the mother had failed to do what was required to have the visitation held at the Daphne Visitation Center. On January 24, 2017, the father amended his motion seeking to enforce the mediated temporary agreement because, he alleged, the mother had still not taken the necessary steps to set up visitation. In February 2017, the father filed a motion in the paternity and child-support action asking the juvenile court to set a hearing on his request for pendente lite visitation.

Later in February 2017, the father filed a motion in the paternity and child-support action objecting to the mother's relocating with the child to Maine. In March 2017, the juvenile court ordered the mother to return the child to Alabama. In that same order, the juvenile court awarded the father visitation with the child each Saturday from 9:00 a.m. to 6:00 p.m. and access to the child via telephone or a videoconferencing application on Mondays, Wednesdays, and Fridays at 6:00 p.m.

In July 2017, the juvenile court entered in the paternity and child-support action an order incorporating an agreement of the parties regarding pendente lite visitation and child support. That agreement was specifically limited to a six-month period, after which, it provided,

9

the parties were to renegotiate visitation and child support or the juvenile court was to adjudicate those issues. The agreement specifically provided:

> "During the six (6) month period, the [f]ather shall receive visitation every Thursday night of the month for dinner from 5:00 p.m. to 7:00 p.m. with the … child and the [m]other at a location to be agreed upon between the parties. The [f]ather shall receive an additional weekday visit, on the weeks the [f]ather does not receive visitation on Saturday, either Monday or Tuesday, as agreed upon by the parties, from 4:00 p.m. to 6:00 p.m. … In addition, the [f]ather shall receive [visitation] every other Saturday, beginning on May 20, 2017, from 9:00 a.m. to 2:00 p.m. with the … child and [m]other at a location to be agreed upon by the parties."

On August 2, 2017, the father filed in the paternity and child-support action another contempt motion alleging that the mother was not complying with the July 2017 agreement and would not allow the father to exercise the agreed-upon visitation. At some point in 2017, the juvenile court stayed the paternity and child-support action because the father had filed for bankruptcy protection. The next document in the record relating to the paternity and child-support action is a copy of the father's August 2018 answer to what he refers to as an amended complaint. In his answer, he states that the mother "disappeared," that he had not been able to visit with the child, and that the mother would

10

not answer his calls, texts, or e-mails. The record also contains a May 2019 motion filed by the father in the paternity and child-support action in which he seeks a finding of contempt against the mother.

In June 2019, the mother filed in the juvenile court her first petition seeking to terminate the father's parental rights, which was assigned case number JU-19-510.01. In July 2019, the father filed in the paternity and child-support action a motion to set aside the temporary agreement, which, by its terms, was to last for only six months and had therefore expired. On October 28, 2019, the juvenile court denied the mother's first petition for the termination of the father's parental rights by an order entered in case number JU-19-510.01. In January 2020, the mother filed a motion in the paternity and child-support action seeking to have the action stayed because, she said, the father's bankruptcy case had been reopened; the juvenile court granted that motion. In May 2020, the father notified the juvenile court that the bankruptcy stay had been lifted and requested that the paternity and child-support action be set for a trial. The juvenile court set the paternity and child-support action for a trial to be held in November 2020, but the trial was continued because of injuries sustained by the mother's counsel in an accident.

The record contains as an exhibit copies of text messages exchanged between the mother and the father between November 21, 2019, and July 20, 2020. The messages between the parties in July 2020, by and large, relate to attempts to settle the visitation and child-support issues pending in the juvenile court. Those messages reflect that the father desired that the parties' proposed agreement be modified to award him additional summer visitation and that the mother was resistant to including additional visitation. Although the text messages initially reflected cooperation between the parties, the messages become less amicable and cease without a resolution of the parties' disagreement. The exhibit reflects that the father did not text the mother for approximately one year and that he resumed his requests to see the child in July 2021.

On July 2, 2021, the mother filed in the juvenile court her second petition seeking to terminate the father's parental rights, which was assigned case number JU-19-510.02 and which is the action underlying this appeal. On July 15, 2021, the mother filed in the paternity and child-support action a motion to continue the trial in that action or to place that action on the "administrative docket" because she had just filed a

second petition to terminate the father's parental rights. The father filed a response in opposition to the mother's motion to continue, to no apparent avail. As previously noted, the juvenile court held the trial on the mother's second termination-of-parental-rights petition in case number JU-19-510.02 over three nonconsecutive days in August 2021, September 2021, and July 2023; the juvenile court entered its judgment terminating the father's parental rights in August 2023.

In its August 2023 judgment terminating the father's parental rights entered in case number JU-19-510.02, the juvenile court does not specify the factual basis for its conclusion that the termination of the father's parental rights is warranted. However, the mother's petition was premised upon the father's alleged abandonment of the child based on his failure to visit with the child or to pay child support. In his postjudgment motion, the father argued that

> "the evidence produced at trial showed a complete lack of [his] intent to abandon his child, but rather demonstrated [that he] became stuck in a broken court system which failed to give him any opportunity to argue the multitude of motions filed in the custody action whereby he was seeking judicial intervention to assist with custody and parenting time with his child."

We begin our analysis by reciting the proper standards applicable to cases involving a custodial parent's attempt to terminate the parental rights of the noncustodial parent.

> "In those cases in which one parent seeks to terminate the parental rights of the other parent, a juvenile court 'must [first] determine whether grounds exist for terminating parental rights' by considering the evidence relating to the factors set out in [Ala. Code 1975,] § 12-15-319(a)[,] and then must 'consider whether all viable alternatives to terminating parental rights have been exhausted.' Ex parte J.E., 1 So. 3d 1002, 1006-08 (Ala. 2008).

> "A juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence. P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d 792, 795 (Ala. Civ. App. 2013). 'Clear and convincing evidence' is '"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."' L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). Although a juvenile court's factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct, K.P. v. Etowah Cnty. Dep't of Hum. Res., 43 So. 3d 602, 605 (Ala. Civ. App. 2010), '[t]his court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing.' K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016). That is, this court

> > "'"must ... look through ['the prism of the substantive evidentiary burden,' Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct.

14

2505, 91 L.Ed.2d 202 (1986),] to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would 'produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.'"'

"K.S.B., 219 So. 3d at 653 (quoting Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008), quoting in turn Ala. Code 1975, § 25-5-81(c))."

B.B. v. J.P., 388 So. 3d 710, 713-14 (Ala. Civ. App. 2023).

"Abandonment" is defined in Ala. Code 1975, § 12-15-301(1), as

"[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

We have further explained that

"'[a]bandonment implies an intentional act on the part of the parent.' L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (construing Ala. Code 1975, former § 26-18-3(1), the predecessor statute to § 12-15-301(1)). This court has explained that abandonment must typically result from the voluntary act of a parent. V.G.J. v. Tuscaloosa Cnty. Dep't of Hum. Res., 368 So. 3d 886, 895 (Ala. Civ. App. 2022) (concluding that a mother's deportation could not serve as the basis of a finding that she had abandoned her children); see also J.B. v. DeKalb Cnty. Dep't of Hum. Res., 12 So. 3d 100, 111 (Ala. Civ. App. 2008) (plurality opinion) (stating that, 'if the [parent] was, in fact, unintentionally, involuntarily, or

15

justifiably prevented from interacting with the children as a parent, then his [or her] conduct cannot be considered abandonment'). That is, 'a juvenile court may premise a finding of abandonment only upon evidence indicating that a parent voluntarily, intentionally, and unjustifiably committed the actions or omissions set out in § 12-15-301, Ala. Code 1975.' C.C. v. L.J., 176 So. 3d 208, 211 (Ala. Civ. App. 2015)."

B.B., 388 So. 3d at 715.

The documentary evidence in the record reflects that the mother has generally resisted the father's right to visit with the child, even when she had entered into voluntary agreements establishing his right to specific visitation periods. The father described the mother as amenable to visitation only on her own terms. The mother testified that she had tried to work with the father to allow him visitation, but, as noted above, she was resistant to the idea of expanded visitation when the father requested it during the attempt to negotiate an agreement to conclude the paternity and child-support action. After the first termination-of-parental-rights petition was denied in November 2019, the mother voluntarily permitted the father what appeared to be supervised visitation, either through visits conducted in her presence or visits in the home of the paternal grandparents on only one weeknight, even though the father was living in Florida at that time. As noted above, after the

16

mother filed the second termination-of-parental-rights petition in July 2021, the father contacted the mother through text messages seeking to visit with the child; in her replies to those messages, the mother referred him to her counsel or requested that he not contact her again, even describing his contact requesting visitation as harassment. Moreover, as previously mentioned, although the mother had allowed the child to visit with the paternal grandparents on Sundays in late 2020 and January 2021, the mother had stopped allowing the child to visit them in late January 2021 because she did not desire that the child have contact with the father during those visits. The mother testified that both she and the child were "upset" by the child's having contact with the father, that the child was "confused" by the contact, and that the mother was concerned because she had been unable to "prepare" the child to see the father during her visits with the paternal grandparents.

The parties litigated the paternity and child-support action for over five years before the mother filed her second petition to terminate the father's parental rights on the ground of abandonment. Because the litigation of the paternity and child-support action has yet to conclude, the record contains no final judgment specifying the father's visitation

rights or child-support obligation. In addition, the record does not contain any pendente lite order setting out the father's visitation rights or establishing his child-support obligation. The last pendente lite order expired, by its terms, in January 2018; the parties did not negotiate another agreement; and the juvenile court failed to adjudicate any pendente lite issues, despite requests by the father that it do so.

Insofar as the mother contended that the father's failure to pay child support or a portion of the child's expenses could support the conclusion that the father had abandoned the child or otherwise support the judgment terminating the father's parental rights, we again note that the father's child-support obligation had not yet been established. M.W. v. Marshall Cnty. Dep't of Hum. Res., 399 So. 3d 287, 292 (Ala. Civ. App. 2024) ("Without an order of child support, the juvenile court could not determine that the mother had 'failed' to perform her duties to provide financial support and to meet the material needs of the children within the meaning of abandonment set forth in § 12-15-301(1)[, Ala. Code 1975]."); B.L. v. Elmore Cnty. Dep't of Hum. Res., 324 So. 3d 829, 837 (Ala. Civ. App. 2020) ("The evidence is not clear that the father had failed to comply with an order of child support or that he was able to provide

support for the material needs of the child during the relevant period and failed to do so."). Furthermore, the mother did not establish the father's income. See § 12-15-319(a)(9) (stating that one potential basis for a conclusion that a parent is unable or unwilling to discharge his or her parental responsibilities is the "[f]ailure by the parent[] to provide for the material needs of the child or to pay a reasonable portion of support of the child where the parent is able to do so" (emphasis added)); A.M. v. R.S., 373 So. 3d 215, 221-22 (Ala. Civ. App. 2022) (explaining that, because the custodians had not proven that the mother in that case had the ability to pay her previously established child-support obligation, they had not established that the mother had failed to provide financial support for the child despite being able to do so). The father testified that, since late 2021, he had not had full-time employment because the company that he had worked for had gone bankrupt. He said that he intended to pursue securing disability benefits because he could not drive and had not been able to find employment because of his inability to drive. He also explained that, due to issues that he had with his vision, he could not perform remote work on a computer. Therefore, the record

lacks sufficient evidence to support a conclusion that the father had failed to provide financially for the child, despite having the ability to do so.

Certainly, the father's actions were not always consistent with his stated desire to develop and maintain a relationship with the child. The father testified that, in July 2020, in frustration over the mother's actions and attitude, he had chosen to wait on his day in court to establish his visitation rights with the child. That day never arrived. The father's attempts to visit with the child after the mother filed the second termination-of-parental-rights petition were rebuffed.

As both this court and our supreme court have before explained, "'"the termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated."'" Ex parte A.S., 73 So. 3d 1223, 1230 (Ala. 2011) (quoting D.O. v. Calhoun Cnty. Dep't of Hum. Res., 859 So. 2d 439, 445 (Ala. Civ. App. 2003), quoting in turn V.M. v. State Dep't of Hum. Res., 710 So. 2d 915, 921 (Ala. Civ. App. 1998)). Both this court and our supreme court have further observed that the termination of parental rights is "'"the last and most extreme disposition permitted by statute."'" Ex parte A.S., 73 So. 3d at 1230 (quoting D.O. v. Calhoun Cnty. Dep't of Hum. Res., 859 So. 2d

20

439, 445 (Ala. Civ. App. 2003), quoting in turn <u>V.M. v. State Dep't of Hum. Res.,</u> 710 So. 2d 915, 921 (Ala. Civ. App. 1998)). "[A] father's right to be a parent to his children is fundamental and a court should terminate those rights 'only in the most egregious of circumstances.'" <u>L.M. v. D.D.F.,</u> 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting <u>Ex parte Beasley,</u> 564 So. 2d at 952).

The parties participated in contentious litigation to establish the father's right to visitation with the child. The father visited the child in compliance with previous pendente lite orders entered in the paternity and child-support action, when the mother did not frustrate those efforts. However, inexplicably, he is still awaiting the conclusion of the paternity and child-support action and an adjudication of his rights to visitation with the child, which he has consistently requested. We agree with the father that the father's actions in failing to visit or to maintain contact with the child while awaiting an adjudication of his visitation rights in the paternity and child-support action, although perhaps not the most advisable, are not sufficient under these circumstances to clearly and convincingly support a conclusion that he "'voluntarily, intentionally, and unjustifiably committed the actions or omissions set out in § 12-15-

21

301 ....'" <u>B.B.</u>, 388 So. 3d at 715 (quoting <u>C.C. v. L.J.</u>, 176 So. 2d 208, 211 (Ala. Civ. App. 2015)).  Accordingly, we cannot agree that the juvenile court's judgment terminating the father's parental rights is supported by clear and convincing evidence of the father's abandonment of the child, and we reverse that judgment and remand the case for the entry of a judgment consistent with this opinion.

REVERSED AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Edwards and Hanson, JJ., concur.