Rel: December 6, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

### CL-2024-0397, CL-2024-0398, CL-2024-0399, and CL-2024-0400

_____

## M.A.D.

### v.

## Jefferson County Department of Human Resources

_____

### CL-2024-0406, CL-2024-0407, CL-2024-0408, and CL-2024-0409

_____

## L.D.

### v.

## Jefferson County Department of Human Resources

**Appeals from Jefferson Juvenile Court**
**(JU-21-1232.02, JU-21-1233.03, JU-21-1234.02, and JU-23-654.02)**

CL-2024-0397, CL-2024-0398, CL-2024-0399, CL-2024-0400, CL-2024-0406, CL-2024-0407, CL-2024-0408, and CL-2024-0409

LEWIS, Judge.

In appeal numbers CL-2024-0397, CL-2024-0398, CL-2024-0399, and CL-2024-0400, M.A.D. ("the father") appeals from judgments entered by the Jefferson Juvenile Court ("the juvenile court") in case numbers JU-21-1232.02, JU-21-1233.03, JU-21-1234.02, and JU-23-654.02, terminating his parental rights to I.D., whose date of birth is May 7, 2017; M.D., whose date of birth is July 24, 2019; L.A.D., whose date of birth is December 28, 2015; and W.D., whose date of birth is April 9, 2022, (collectively "the children"). In appeal numbers CL-2024-0406, CL-2024-0407, CL-2024-0408, and CL-2024-0409, L.D. ("the mother") appeals from those same judgments to the extent that her parental rights to the children were terminated. We affirm the judgments.

Procedural History

On May 7, 2017, the Jefferson County Department of Human Resources ("DHR") filed petitions to terminate the parental rights of the father and of the mother to the children. The father filed responses to the petitions on November 25, 2023. After a trial that was held over multiple days, the juvenile court entered essentially identical judgments

2

CL-2024-0397, CL-2024-0398, CL-2024-0399, CL-2024-0400, CL-2024-0406, CL-2024-0407, CL-2024-0408, and CL-2024-0409

on May 15, 2024, terminating the parental rights of the father and of the mother to the children. The juvenile court's judgments stated, in pertinent part:

"The parents maltreated [L.A.D.] by failing to seek medical treatment for a year and a half after [she] ingested lye. The parents were aware that [L.A.D.] was in need of medical attention and willfully neglected their responsibility to seek appropriate treatment for her until such time as she was within hours to a day of death. As a result of the parent[s'] willful neglect, [L.A.D.] has permanent damage to her esophagus, underwent multiple surgeries, suffered significant pain, and must use a g tube to receive proper nutrition. The father continues to express his belief as it relates to the current condition of [L.A.D.] and her ability to maintain appropriate nutrition without the use of a g-tube, despite being informed by medical professionals that she must use a [gastrostomy tube ("g-tube")] now[] and will likely need one for the rest of her life. Proper medical care is essential to maintaining the health of [L.A.D.], and ongoing medical care is absolutely necessary.

"The parents have consistently expressed that they believe medical intervention and care are unnecessary, except in emergencies. They have shown through their actions for years that they do not seek appropriate medical or dental attention for themselves or their children. While they indicated they had changed their views regarding medical intervention at the [termination-of-parental-rights] trial[,] they are not credible. Upon consideration of their history of contrary statements, their history [of] failing to seek medical treatment for their children, including during the pendency of this case, their demeanor and facial expressions at trial, as well as their contradicting statements in this matter, their

3

veracity is questionable at best. This Court found them to be untruthful multiple times during the trial.

"The parents maltreated older siblings of th[e] child[ren]. The mother's parental rights were involuntarily terminated to multiple siblings of th[e] child[ren]. The father's [parental] rights were involuntarily terminated to a sibling of th[e] child[ren]. They have shown a pattern of neglecting the needs of their children for over a decade, and have not demonstrated that they adjusted their circumstances, even after their parental rights were terminated as to the child[ren]'s older siblings.

"The parents have shown a history of a lack of protective capacity due to an affinity for drug use. They neglected the child[ren]'s older siblings while using drugs in the past[] and continued to do so with the current set of children. [I.D.] was subjected to sexual abuse by a housemate. Testimony presented indicated that the molestation occurred while the parents would smoke marijuana and sleep for excessive periods of time.

"The mother suffers from an emotional illness of a duration or nature as to render her unable to care for the needs of the child[ren], specifically narcissistic personality disorder with turbulent features. The father suffers from an emotional illness of a duration or nature that renders him unable to care for the needs of the child[ren], specifically narcissistic personality disorder with paranoid features. Efforts at rehabilitation have been unsuccessful.

"The parents failed to provide for the material needs of the child[ren] or to pay a reasonable portion of support where the parents were able to do so. The parents have been and remain underemployed. They have intentionally under-reported their income, including on an Affidavit of Substantial Hardship submitted to this Court. They have not shown a history of

4

stable employment or current employment that is adequate to provide for the material needs of the child[ren].

"…[S]ignificant emotional ties have developed between the child[ren] and [their] current foster parents. [The children] ha[ve] been in a stable and satisfactory environment with [their] foster parents …. Severing the ties between the child[ren] and [their] current foster parents is contrary to the best interest of the child[ren].

"After due consideration of the testimony and evidence presented, the Court finds from clear and convincing evidence, competent, material and relevant in nature, that the child[ren] named herein [are] dependent child[ren] pursuant to Title 12-15-102, Code of Alabama, 1975.

"The Court does find, pursuant to Title 12-15-319, Code of Alabama, 1975, that the mother and [the] father are unable to discharge their responsibilities to and for th[e] child[ren]; that the conduct and condition of the mother and the … father is such as to render them unable to properly care for th[e] child[ren], and that such conduct and condition are unlikely to change in the foreseeable future.

"The mother and [the] father have failed to adjust their circumstances to meet the child[ren]'s needs, pursuant to Title 12-15-319, Code of Alabama, 1975 and Title 12-15-301, Code of Alabama, 1975.

"The Court also finds that there are no suitable relative resources willing or able to receive custody of the child[ren]. The Court finds there is no viable alternative to termination of parental rights in this case.

"In addition, the Court finds that the State of Alabama Department of Human Resources is willing and able to accept

permanent legal custody, as provided in Title 12-15-320, Code of Alabama, 1975.

"In accordance with Public Law 96-272, as amended by Public Law 105-89 and Section 12-15-319, Code of Alabama 1975, this Court further finds that it would be in the best interest of the child[ren] to terminate the parental rights of the child[ren]'s mother and … father.

"It is therefore ORDERED, ADJUDGED, and DECREED as follows:

"1. That the parental rights of the mother … are hereby permanently severed and terminated as to [the children];

"2. That the parental rights of the … father … are hereby permanently severed and terminated as to [the children];

"3. That [the children are] hereby placed into the permanent legal custody of the State of Alabama Department of Human Resources;

"4. In accordance with Public Law 96-272, as amended by Public Law 105-89 and Section 12-15-312, Code of Alabama 1975, the Court finds that placement of the … child[ren] with [the] mother or … [the] father would be contrary to the said child[ren]'s welfare and interests based on the mother and … [the] father failing to discharge their responsibilities to the child[ren] and their failure to adjust their circumstances to meet the needs of the child[ren] and other evidence presented at trial.

"5. This Court finds that reasonable efforts to reunite said child[ren] with family have been made by the Department of Human Resources, and that such efforts at reunification have failed based on the evidence presented at trial. Further, the Court finds that the Department of Human Resources has

made reasonable efforts to finalize the permanency plan for [the children] and concurs with the plan for the child[ren] of adoption by current foster parent[s]."

(Capitalization in original.) The father timely filed his notices of appeal on May 28, 2024. The mother timely filed her notices of appeal on May 30, 2024. See Rule 4(a)(2), Ala. R. App. P.

Summary of the Evidence

In 2015, the Georgia Department of Child Protective Services became involved with the mother and the father and the children's four half siblings, who were living with the mother and the father at that time. One of those children was the father's child, and the other three were the mother's. The father's mother and sister testified that, while those children were in the parents' care, they had observed those children to be dirty. The father's sister testified that she had observed the children's half siblings unsupervised with full diapers. On one occasion, she found those children in a dog kennel, dirty, with full diapers, without food or water, and red in the face. She testified that the parents were asleep at that time. The father's sister also testified that she witnessed the father blowing marijuana in one of those children's faces as that child was breastfeeding.

7

While the children's half siblings were in protective custody, the parents made the decision to flee Georgia with L.A.D., who was born in Alabama in 2015 and was not in protective custody. A termination-of-parental-rights action was brought, but the parents did not challenge the termination of their parental rights as to the children's four half siblings.

After leaving Georgia, the parents lived a nomadic lifestyle, backpacking across the country, living in tents and in the homes of other individuals. The mother gave birth to I.D. in a bunker in the side of a hill and gave birth to M.D. in a tent. The mother received no prenatal care, and the births were not attended by a medical practitioner. The parents did not take any of the children to visit a medical doctor or a dentist. The parents used marijuana, foraged for fruit and vegetables, and sometimes visited soup kitchens. They considered themselves sovereign citizens and did not obtain birth certificates for L.A.D., I.D., and M.D.

While living at the home of friends in the spring of 2020, L.A.D. ingested lye. The parents testified that L.A.D. drooled for an hour but was able to eat that same day. Testimony from Dr. Michael Taylor, an expert in general pediatrics and pediatric child abuse, indicated that the

8

ingestion of lye causes such pain that children are normally given a morphine drip. However, the parents did not take L.A.D. for medical attention. According to the parents, L.A.D. had some food aversions but was otherwise able to eat until shortly before the mother took L.A.D. to the hospital in December 2021. The evidence indicated that L.A.D. had a complete esophageal stricture such that no liquid could pass through. She was severely malnourished, dehydrated, hypoglycemic, and close to death. Dr. Taylor testified that it would have taken months for L.A.D. to decline to the condition she was in upon admission to the hospital. By the time of the trial, L.A.D. had undergone multiple surgeries and received most of her nutrition via a gastrostomy tube ("g-tube").

Natlie Brodie, a DHR crisis stabilization worker, testified that, when I.D. and M.D. arrived at the hospital, they appeared very dirty and smelled of urine, feces, and body odor. The evidence also indicated that, at the same house where L.A.D. ingested lye, the parents had allowed a male to care for and bathe I.D., and he had repeatedly sexually abused I.D.

DHR was awarded custody of L.A.D., I.D., and M.D. in December 2021. The parents were eventually allowed unsupervised visitation with

those children, and they were allowed to maintain custody of W.D. after his birth. L.A.D.'s foster mother testified that, when L.A.D. returned from unsupervised visitations, she was dirty and odorous. After the parents gave L.A.D. incorrect dosages of her medications during an unsupervised visitation, the visitations were required to be supervised. DHR was also awarded custody of W.D. after the dosing error.

Dr. Michael Keller, a pediatric dentist, testified that L.A.D. had 13 cavities, some of which were visible to the naked eye and that I.D. had 6 cavities. Dr. Keller testified that he extracted six of L.A.D.'s teeth, placed four crowns, completed two root canals, and placed two fillings in her teeth.

The evidence indicated that, while the children were in foster care, the parents delayed giving consent for medical procedures that were recommended for the children. The father testified that he did not think that L.A.D. needed the g-tube anymore. Micky Bendt, who supervised visitations, testified that, as recently as April 2024, the parents had stated that L.A.D. did not need the g-tube. However, testimony from Dr. Rachel Kassel, who treated L.A.D., indicated that L.A.D. received 82-98% of her nutrition through the g-tube, that it was essential, and that it may

even be necessary for her entire life. The foster mother for L.A.D. and W.D. testified that the father told L.A.D. in February 2023 that the bad people were keeping her from the parents.

D.G. testified that he worked with the father at a restaurant until the father's employment was terminated in the spring or summer of 2023. According to D.G., the father stated multiple times that, if the children were returned to him, he would go off the grid again. While the children were in foster care, the mother posted an "Amazon Wishlist" on social media, asking for items to use for camping, including a disposable skin stapler.

Dr. Jack Carney, a psychologist, testified that he conducted psychological evaluations on the father and the mother. According to Dr. Carney, the mother and the father both have narcissistic personality disorders, cannot properly care for the children, and will not change in the foreseeable future. Both Dr. Taylor and Dr. Victoria Anderson, the pediatrician for L.A.D. and W.D., testified that they would be concerned about the parents taking care of the children.

Madison Hill, a child welfare worker for DHR, testified that the parents earn only approximately $750 per month. Although the parents

are both able-bodied, the mother works only part time making food deliveries. There was also evidence indicating that the father had given away some of his tip money to other employees. Hill testified that the parents have not demonstrated the ability to apply what they learned through services to their parenting of the children.

Both the mother and the father consistently tested negative for drugs and were both compliant with services. The parents had housing and maintained employment. They provided material items to the children while the children were in foster care. However, with respect to the date of the start of trial, they had only recently been ordered to pay child support, and they had made only one child-support payment. The mother testified that the parents had adjusted their views on medical care. Jamiyah Freeman, a family development specialist for Health Connect America, testified that the mother stated that, if the children were returned to her and the father, she planned to send the children to school and to take the children to the same doctors that the children had been seeing. The children's respective foster parents desired to adopt them.

Standard of Review

"A judgment terminating parental rights must be supported by clear and convincing evidence, which is '"'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'"' C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'"[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly … establish the fact sought to be proved."

"'KGS Steel, Inc. [v. McInish], 47 So. 3d [749,] 761 [(Ala. Civ. App. 2006)].

> "'… [F]or trial courts ruling … in civil cases to which a clear-and-convincing-evidence standard of proof applies, "the judge must view the evidence presented through a prism of the substantive evidentiary burden[,]" [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial

13

court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'

"Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id."

M.W. v. Marshall Cnty. Dep't of Hum. Res., [Ms. CL-2023-0809, Mar. 15, 2024] ___ So. 3d ____, ____ (Ala. Civ. App. 2024).

## Discussion

## I.

On appeal, the father and the mother both argue that the juvenile court erred in determining that there was sufficient evidence that grounds for termination of their parental rights existed. Section 12-15-319, Ala. Code 1975, provides, in pertinent part:

"(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of [the] child[ren] are unable or unwilling to discharge their responsibilities to and for the child[ren], or that the conduct or condition of the parents renders them unable to properly care for the child[ren] and that the conduct or condition is unlikely to change in the foreseeable future, it

14

may terminate the parental rights of the parents. In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child[ren]. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child[ren] and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:

"....

"(2) Emotional illness, mental illness, or mental deficiency of the parent[s], or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent[s] unable to care for the needs of the child[ren].

"....

"(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.

"(8) That parental rights to a sibling of the child[ren] have been involuntarily terminated.

"(9) Failure by the parents to provide for the material needs of the child[ren] or to pay a reasonable portion of support of the child[ren] where the parent[s] [are] able to do so.

"....

"(12) Lack of effort by the parent[s] to adjust [their] circumstances to meet the needs of the

15

child[ren] in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.

"(13) The existence of any significant emotional ties that have developed between the child[ren] and [their] current foster parent or parents, with additional consideration given to the following factors:

"a. The length of time that the child[ren] ha[ve] lived in a stable and satisfactory environment.

"b. Whether severing the ties between the child[ren] and [their] current foster parent or parents is contrary to the best interest of the child[ren].

"c. Whether the juvenile court has found at least one other ground for termination of parental rights.

In this case, there was evidence indicating that both parents had narcissistic personality disorders and that they were unable to properly care for the children for the foreseeable future. Both parents had also had their parental rights terminated previously. Moreover, the children were all placed in foster homes with foster parents who desired to adopt them.

16

The parents point out that they had maintained housing, employment, and sobriety, and that they had completed the services requested by DHR. However, as the juvenile court's judgments found, the parents had a long history of child neglect spanning multiple years and involving multiple children. The parents' neglect had ultimately resulted in L.A.D. almost losing her life. There was evidence tending to show that the parents had progressed, but there was other evidence indicating that the parents were simply complying with DHR in a perfunctory manner and did not genuinely intend to change their circumstances. Although the parents testified that they had changed, the juvenile court found the parents' testimony to lack credibility. "[O]ur standard of review does not permit this court to reweigh the evidence to reach a different conclusion [than the juvenile court reached]." J.G. v. Lauderdale Cnty. Dep't of Hum. Res., 379 So. 3d 444, 448 (Ala. Civ. App. 2023) (citing Ex parte Bodie, 377 So. 3d 1051 (Ala. 2022)).

The father specifically argues that there was no evidence to support the juvenile court's finding that "[t]he parents failed to provide for the material needs of the child[ren] or to pay a reasonable portion of support where the parents were able to do so." He points out that the parents

17

had provided items for the children and were only recently ordered to pay child support. We note, however, that the juvenile court stated that "[t]he parents have been and remain underemployed." The evidence indicates that the father had been employed but had given away tip money. Additionally, although the mother was able-bodied, she worked only part time making food deliveries. We cannot conclude that the juvenile court exceeded its discretion in determining that the parents were able to contribute monetarily but chose not to do so until they were placed under a court order shortly before the trial.[1]

## II.

The father also argues that maintaining visitation with the parents is a viable alternative to termination of his parental rights. We note, however, that the juvenile court did not make any specific findings of fact

---

[1]The father misquotes and misconstrues B.L. v. Elmore Cnty. Dep't of Hum. Res., 324 So. 3d 829 (Ala. Civ. App. 2020). He states, purporting to quote B.L.: "In absence of an order requiring parent to pay child support in compliance with Ala. Code 1975, § 12-15-314(e), parent could not be found to have failed to pay child support." The father's brief, p. 71. However, that language is not in B.L., and the court in B.L. did not hold that a child-support order must exist in order for a juvenile court to find that a parent failed to support his or her child in the context of a termination-of-parental-rights action.

concerning the viability of maintaining the status quo, and the father did not file a postjudgment motion challenging the sufficiency of the evidence regarding that issue. Therefore, the father's argument on this point was not preserved for this court's review. See New Props., L.L.C. v. Stewart, 905 So. 2d 797, 801-02 (Ala. 2004).

## III.

Finally, the mother argues that the juvenile court erred in denying the admission of a transcript from a June 10, 2022, hearing wherein DHR's attorney stated that the parents had been compliant with services and that there were no other services that could be offered. We note, however, that the juvenile court allowed the mother to testify as to her recollection of what DHR's attorney stated at the June 10, 2022, hearing. The mother does not point to any specific statement that was not allowed to be admitted that prejudiced her case. Therefore, we conclude that any error in not admitting the transcript was harmless. See Rule 45, Ala. R. App. P.

## Conclusion

Based on the foregoing, we affirm the juvenile court's judgments.

CL-2024-0397, CL-2024-0398, CL-2024-0399, CL-2024-0400, CL-2024-0406, CL-2024-0407, CL-2024-0408, and CL-2024-0409

The motions to strike filed by DHR and the guardian ad litem are denied as moot. We note, though, that this court has not considered any exhibits that were not admitted as evidence during the trial.

CL-2024-0397 -- AFFIRMED.

CL-2024-0398 -- AFFIRMED.

CL-2024-0399 -- AFFIRMED.

CL-2024-0400 -- AFFIRMED.

CL-2024-0406 -- AFFIRMED.

CL-2024-0407 -- AFFIRMED.

CL-2024-0408 -- AFFIRMED.

CL-2024-0409 -- AFFIRMED.

Moore, P.J., and Edwards, Hanson, and Fridy, JJ., concur.